ELIZABETH J. CROWE vs. MICHAEL FONG.

No. 97-P-0013.

Bristol. March 26, 1998. - November 5, 1998.

Present: WARNER, C.J., SMITH, & PERRETTA, JJ.

*Parent and Child,* Child support.

In an action seeking modification of a child support order, the judge's find-
ings, which were supported by the record, that there were material changes
in the father's financial circumstances, and the judge's ruling that the
father's witnesses were not credible, warranted an increase in the father's
child support payments from $75 to $150 per week. [678-683]

CIVIL ACTION filed in the Bristol Division of the Probate and
Family Court Department on September 10, 1990.

A complaint for modification of child support, filed on July
18, 1994, was heard by *Prudence M. McGregor,* J.

*Paul F. Lorincz* for the defendant.
*Paul M. Cronan* for the plaintiff.

WARNER, C.J. Following a trial on a complaint for modifica-
tion of child support under G. L. c. 209C, §§ 9, 20, a judge of
the Probate and Family Court ordered a 100 per cent increase in
the father's, Michael Fong's, weekly child support payment,
from $75 to $150. On appeal from the judgment and certain
postjudgment rulings, Fong contends that the judge erred in
finding that the parties' circumstances had undergone a material
change sufficient to warrant a modification since entry of the
earlier order, and in attributing certain unclaimed income to
him. For the reasons explained below, we affirm.

We take the facts from the judge's uncontested findings of
fact and the uncontroverted evidence in the record before us.
The parties, Elizabeth Crowe and Michael Fong, were never
married. Their daughter was born on October 25, 1989, and
resides with her mother. Neither Fong nor his parents have ever
seen the child or made any attempt to establish a relationship

with her. The child's parents met when Crowe was hired to work as a waitress at one of two Chinese restaurants managed by Fong. At the time, Fong owned fractional interests in the restaurants, as well as corresponding interests in the realty corporations that owned the land on which the restaurants were located. Between 1980 and 1989, he worked at the restaurants somewhere between eighty and ninety hours per week, and he testified he had been paid $1,500 per month for his services. During those years, Fong owned (or at least "drove") several luxury automobiles, including a Porsche, for which he paid $18,000, and a $22,000 Limited Edition Nissan 300ZX. He also leased a Lotus for $989 per month. In addition, in 1985, Fong lived in a single family home in Attleboro, which he and his sister purchased for $65,000.

Immediately after learning that Crowe was pregnant in the spring of 1989, Fong quit his job and moved, temporarily, to Florida. Approximately three months later, he returned to Massachusetts and began working at Art's 3-Hour Cleaners, Inc., a business owned and operated by his mother. He worked thirty hours per week and was paid a salary of $275. In December, 1989, Fong's father, Arthur Fong, purchased a three-bedroom, two-bath, waterfront home with a two-car garage in Mansfield. Shortly thereafter, Fong moved into the house and lived there on a rent-free basis. Despite testifying at trial that he was "broke," Arthur Fong paid $49,000 in cash toward the $163,000 purchase price of the home. In 1990, Fong married his present wife.

In 1991, a judgment of paternity was entered by the Bristol County Probate and Family Court establishing Fong as the father of Crowe's daughter. At that time, the parties stipulated to a weekly child support order of $75, with Fong providing medical insurance for the child, and physical and legal custody going to Crowe. At that time, Crowe was disabled and earning $17 per week in dividends and interest. She had recently received a worker's compensation settlement of approximately $28,000. The settlement made up a portion of her Shawmut Bank savings account which totaled $45,692.80. Crowe also owned an automobile with an equity value of $5,525. Her weekly expenses were $438, including rent.

Fong is a high school graduate. At the time the $75 support order went into effect, he was employed in his mother's dry cleaning business earning $275 weekly. His stated assets

included $35 in a savings account, a one-seventh interest in Chinatown Gardens, Inc., a Chinese restaurant located in Attleboro, and two-thirds of a one sixth interest in the North Attleboro Chinatown Restaurant, Inc., both of "undetermined" value, as well as corresponding interests in the aforementioned realty corporations. He lived with his wife and their son in the home owned by Arthur Fong, and listed his expenses as $252 per week.

Between 1991 and the time she filed her complaint for modification, Crowe earned a bachelor's degree from the University of New Hampshire and a master's degree in early childhood education from Bridgewater State College, and, in 1996, she was earning $440 per week as a teacher and administrator. She also received $2.50 in dividend and interest income, and $75 per week in child support. Her weekly expenses were $427, and included rent for an apartment and day care for the child. Her assets consisted of approximately $5,500 in savings and an automobile valued at approximately $1,500. She was also carrying a college loan in the amount of $3,000. Crowe anticipated that her expenses would increase to $497 as a result of having to leave the apartment in which she was living, and which had been provided by her employer at a reduced rate.

At the time the complaint for modification was filed by Crowe, Fong claimed to be performing the same job he had in 1991 and earning the same salary. He continued to reside, with his wife and their now three sons, in the home owned by his father. In addition, his father had given him the use of a 1983 Volvo. Fong listed his weekly expenses at $142, exclusive of child support payments for his daughter. This figure represented a $110 decrease from 1991, and included expenses for Fong's two additional children born since that time, one of whom was autistic and therefore attended a "special" school. Fong testified that his son's special needs prevented him (Fong) from working more than thirty hours per week.

Approximately two years after the 1991 support order went into effect, Fong sold his interests in the restaurants for $115,000.[1] At trial, he admitted receiving $110,000 as a result of the sale but testified that, of the proceeds, $40,000 was repaid to the cousin who had originally loaned him the money to

---

[1]Fong testified that he received $110,000 for his interest in the businesses and $5,000 in exchange for a covenant not to compete. His 1993 Federal

acquire the interests, $23,000 was paid in legal fees in connection with the sale, and $35,000 was paid to his parents for loans they had made to him in the past. Fong's testimony regarding the existence of these loans was, however, unsupported by documentation. Although Fong's parents also testified to the existence of the loans, they similarly could not produce any supporting documentation.

In addition to being unable to account for his share of the proceeds from the sale of the restaurants, Fong's testimony regarding his financial affairs was consistently evasive and unsubstantiated. For example, with respect to the house he purchased with his sister, Fong testified at his deposition that the down payment was $3,000 but at trial stated that it was closer to $10,000. The documentary evidence, however, indicated the downpayment was $22,500. Fong also denied ever having the North Attleborough restaurant appraised until a copy of a written appraisal requested by him was presented to the court. He also denied that he and his father had offered to purchase their partners' interests in the restaurants for $600,000, until a copy of the signed offer was produced.

The judge found that Fong's testimony and that of his parents were not credible, and that "through maneuvering of . . . assets, [the family had] arranged it such that with minimal reported income, [Fong] and his household [were able to] live in a large waterfront home, drive a Volvo (albeit a 1983 Volvo); spend $7,500 for wedding rings, and allegedly dispose of approximately $115,000 in a three-year period." Specifically, the judge found that Fong had received $110,000 from the sale of the restaurants, that the loans he claimed to have repaid out of the proceeds did not exist, and that the legal fees from the transaction were smaller than he claimed. She also found that Fong was financially astute as a result of his work in the family-owned restaurants and rejected his testimony that he earned only $275 per week from Art's Cleaners after being employed in the same job for six years. Instead, she concluded that Fong worked thirty hours per week "at his own choosing" and that he was intentionally underemployed. Accordingly, she attributed an additional $97.10 in weekly income to him. The judge also found that Fong's rent-free occupancy of his parents' home was "perquisite income" from his employer and attributed an ad-

income tax return reported a gain of $98,250 and a net capital gain of $48,513 as a result of the transaction.

ditional $350 per week, the fair market rental value of the home to him, as income. We review for an abuse of discretion. *Canning* v. *Juskalian*, 33 Mass. App. Ct. 202, 205 (1992).

The Massachusetts child support guidelines (guidelines) apply to Crowe's request for modification. See G. L. c. 209C, § 9(*c*). The guidelines provide a mathematical formula for computing noncustodial parents' support obligations. See Guideline III.[2] According to their preamble, the guidelines are intended to "encourage joint parental responsibility for child support in proportion to, or as a percentage of, income . . . [and, among other things] [t]o protect a subsistence level of income of parents at the low end of the income range . . . ." "Income" is defined broadly in Guideline I-A as "gross income from whatever source . . . includ[ing], but . . . not limited . . . to . . . salaries and wages . . . [and] perquisites or in kind compensation to the extent that they represent a regular source of income." See *Rosenberg* v. *Merida*, 428 Mass. 182, 187 (1998) (describing definition of income contained in Guideline I-A as "broad").

Pursuant to the preamble to the guidelines, a court may modify a child support order "upon showing a discrepancy of 20% or more between an established order and a proposed new order calculated under [the] guidelines"; this rule does not apply, however, if the twenty per cent discrepancy "is due to the fact that the amount of the current support order resulted from . . . an allowance of an agreement of the parties and there has not been a change in the circumstances which resulted [in the established order]."[3] *Ibid.* The modification standard to be applied in such circumstances is similar to the common law rule that a party seeking to modify a judgment for alimony or child support must "demonstrate a material change of circumstances

---

[2]The child was six years old at the time of trial. Accordingly, the guidelines' basic order mandates support in the amount of fifteen to twenty-seven per cent of the father's monthly income, depending upon his income range. A two per cent variation lies solely within the discretion of the trial judge.

[3]This standard differs slightly from the modification standard set forth in G. L. c. 208, § 28. Under that standard (applicable to children of divorced parents), even if there has been no change in circumstances since the established order was put in place, "the order shall be modified in accordance with the guidelines unless the court finds that the guidelines amount would be unjust or inappropriate under the circumstances and that the existing order is consistent with the best interests of the child." G. L. c. 208, § 28, as amended through St. 1993, c. 460, § 61.

since the entry of the earlier judgment." *Schuler* v. *Schuler*, 382 Mass. 366, 368 (1981). *Cournoyer* v. *Cournoyer*, 40 Mass. App. Ct. 302, 305 (1996).

Turning to the case before us and viewing the evidence in its entirety, we conclude that the judge's findings, supplemented by the record before us, support the order increasing Fong's weekly child support payments from $75 to $150. See *Thomsen* v. *Thomsen*, 12 Mass. App. Ct. 1010, 1012 (1981), quoting from *Heistand* v. *Heistand*, 384 Mass. 20, 26 (1981). Fong maintains on appeal that no material change in the parties' circumstances occurred between entry of the initial order in 1991 and 1996, the year in which the complaint for modification was filed. He therefore argues that issuance of a new support order was erroneous. See *Cournoyer* v. *Cournoyer*, *supra* at 305. We disagree.

Although Fong correctly points out that he lived in the same house, was employed in the same job, and claimed to be earning the same salary in 1996 as he had been in 1991, he conveniently ignores the significant changes in his financial condition during that time which, in our view, constitute the "material change of circumstances" necessary to support a modification. *Cournoyer* v. *Cournoyer*, 40 Mass. App. Ct. at 306-307. These changes include the increase in the parties' daughter's needs and the corresponding costs and expenses, the claimed decrease in Fong's weekly living expenses from $252 to $142, and, most important, Fong's receipt of $110,000 as a result of the liquidation of his business interests. That some of the circumstances upon which the judge relied in calculating Fong's child support obligation existed in 1991 did not preclude her from considering them in determining his ability to pay in 1996. See *ibid.* (considering factors present prior to entry of previous judgment along with recent changes in financial circumstances of the parties in determining whether modification was appropriate).

We also conclude that the judge properly found that Fong's testimony, and that of his parents, regarding Fong's alleged repayment of loans from the proceeds of the sale of his business interests, was not credible.[4] "The trial of a case is not to be converted into a game of hide and seek." *Hillery* v. *Hillery*, 342

---

[4]In her "further rationale," issued approximately thirty days after the initial findings of fact and rulings of law, the judge expressly stated that, although she could have treated $75,000 of the $115,000 Fong received when he

Mass. 371, 375 (1961). Rather, each party in a modification proceeding "has the obligation to provide [complete and accurate] financial data to the other [party] and to the court." *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 822 (1985). Where, as here, the production of documentation to support Fong's claimed expenditures was a matter entirely within his control, his making "these important records unavailable for examination could properly be treated by the . . . court as conduct in the nature of an admission." *Kane* v. *Kane*, 13 Mass. App. Ct. 557, 559 (1982). Accordingly, the judge was entitled not only to regard Fong as an evasive witness, but to draw inferences adverse to him from the uncertainties surrounding his financial affairs. *Allen* v. *Allen*, 25 Mass. App. Ct. 515, 519 (1988). Similarly, given the complete lack of documentary evidence to substantiate Fong's claimed expenditures, the judge acted within her discretion in disregarding certain claimed items and substituting reasonable figures for others. *Smith-Clarke* v. *Clarke*, 44 Mass. App. Ct. 404, 406 (1998). In these circumstances, we think the judge would have been justified in treating at least $75,000 of the $115,000 Fong received when he liquidated his business interests as available to him to produce interest income of approximately $115 per week[5] for purposes of calculating his support obligation. See note 4, *supra*. See also note 8, *infra*. Nor was the judge limited to considering income on the $75,000. It would have been permissible to treat the $75,000 as a fund out of which weekly support payments were to be made.

Fong next contends that the judge erred in concluding that he was intentionally underemployed and in attributing to him additional weekly income of $91.70. There was no error. For purposes of determining child support, "[t]he earning capacity rather than the actual income of a parent may be considered." *Flaherty* v. *Flaherty*, 40 Mass. App. Ct. 289, 291 (1996), citing *Canning* v. *Juskalian*, 33 Mass. App. Ct. at 206. In accordance with the guidelines, the court must consider whether a party is "earning substantially less than he or she could through reasonable effort." Guideline II-H. If a judge determines by specific

liquidated his business interests as available to him to produce interest income of approximately $115 per week when calculating his support obligation, she did not do so. We consider the propriety of the judge's findings on this issue, however, because they are relevant to our analysis.

[5]In her "further rationale," the judge calculated the amount of interest income available to Fong based upon an eight per cent rate of interest.

and detailed findings of fact, as was done here, that "an individual will be able to earn additional income with reasonable effort . . . [a]ttribution of [such] income may be appropriate." *Flaherty* v. *Flaherty, supra* at 291.

Michael Fong admitted to having worked between eighty and ninety hours per week as the manager of two restaurants between 1980 and 1989. He testified that he was responsible for overseeing the day-to-day operations of the restaurants, including hiring and supervising over sixty employees and handling some of the restaurants' finances. His duties also included acting as a cashier and bartender in one restaurant. For these services, Fong testified that he was paid approximately $1,500 per month, or $18,000 per year, in contrast to the $14,300 he claimed to be earning seven years later. At the time of trial, Fong claimed that he could no longer work even forty hours per week, because of the demands of caring for his autistic son. The record, however, strongly suggests that the precipitating factor in Fong's decision to quit his restaurant job was the announcement by Elizabeth Crowe that she was pregnant, rather than the increased demands of caring for a child with special needs. Indeed, Fong returned to Massachusetts and began working part-time for a salary of $275 in 1989; his autistic son was not born until 1992. Moreover, although Fong allegedly earned only $275 per week, his brother and sister, both of whom performed routine tasks associated with running the family dry cleaning business, were paid eleven dollars an hour and frequently worked overtime. In these circumstances, we think the judge would have been justified in attributing to Fong weekly income of at least $440, a figure equal to that earned by his siblings.[6]

With respect to the judge's attribution to Fong of "perquisite income" in the amount of $350 per week, or the fair rental value of the home in which he lived, although not actual income in the sense that it is "cash in hand," the ability to live rent-free undoubtedly reduced Fong's out-of-pocket expenditures significantly and, accordingly, should be valued. See Gold-Bikin, Defining Income Is the Key to Effective Lawyering, 10 (No. 4) Family Advoc. 13, 14 (1988). Moreover, the judge's characterization of Fong's free use of the home as "perquisite

---

[6]Fong's lavish lifestyle prior to entry of the initial support order could properly be considered by the judge as evidence of his "present and future earning capacity, including his demonstrated ability to earn income and acquire assets." *Mancuso* v. *Mancuso*, 12 Mass. App. Ct. 973, 974 (1981).

or in-kind income" for purposes of calculating his support obligation under the guidelines is not without support in the record and is, therefore, entitled to deference. See *Thomsen* v. *Thomsen*, 12 Mass. App. Ct. at 1012, quoting from *Heistand* v. *Heistand*, 384 Mass. at 26.

Fong testified that he moved into his present home in 1989, shortly after returning to Massachusetts and beginning his present job. He also stated that he and his family had lived in the home for seven years at the time of trial, and that he had never paid rent. The record further indicates that Fong's brother, Jeffrey, who worked with him in the business, lived rent-free in the family home and that his sister, Alison, was also provided with the opportunity to do so. Given the broad definition of income envisioned by the guidelines, we cannot say that the judge's characterization of this benefit as "perquisite income" was an abuse of discretion. Contrast *Hillery* v. *Hillery*, 342 Mass. at 373-374 (decided prior to the adoption of the guidelines, and holding that certain benefits received by the father from family business were loans or gifts, dependent on the generosity of others and, therefore, subject to discontinuance at any time).[7]

Where, as here, the fair rental value of the property is high compared to Fong's reported or even potential income, attributing the full amount to him might considerably distort his true financial position. However, even if, as it appears, the figure attributed to Fong based upon his ability to live rent-free might be high, our review of the entire record leads us to conclude that the judge's order was appropriate.[8] Cf. *Thomsen* v. *Thomsen*, 12 Mass. App. Ct. at 1012. In sum, the order properly

[7]Any risk of prejudice to Fong resulting from the possible discontinuance of this benefit in the future is eliminated by his ongoing right to seek a modification in the event he is able to demonstrate that his financial situation has undergone the requisite "material change."

[8]If the value of Fong's ability to live rent-free were reduced from $350 to $175 per week, the present support order would be consistent with the guidelines. Using that figure and the others set out in our analysis, our calculation still results in a weekly support order of $150.

Child Support Guidelines

1. Basic Order

| | |
|---|---|
| a) Non-custodial gross weekly income (less prior support orders actually paid, for child/family | $730.00 |

"took into account [Fong's] present and future earning capacity, including his demonstrated ability to earn income and acquire assets by employment . . . [and] business investments, and by the acquisition of capital assets. [It] also gave [appropriate] weight to the fact (as stated in the findings) that [Fong's] testimony 'was fraught with deception in an attempt to hide from the [c]ourt his net worth and his ability to pay for the support of his . . . child[].' " *Mancuso* v. *Mancuso*, 12 Mass. App. Ct. at 974. To hold otherwise in these circumstances would be to reward Fong for engaging in the all too common practice of

| | | |
|---|---|---|
| other than the family seeking this order) | | |
| b) % of gross/number of children (from chart A) | 27 % | |
| c) Basic order (a) x (b) | (A) | $197.00 |

2. Adjustment for Ages of Children

| | | |
|---|---|---|
| a) Age of oldest child | 6 | |
| b) % of increase for age (from chart B) | 0 | |
| c) Age add on (2b) x (A) | 0 | |
| d) Adjusted order (A) + (2c) | (B) | $197.00 |

3. Custodial Parent Income Adjustment

| | |
|---|---|
| a) Custodial parent gross income | $23,000 |
| b) Less $15,000.00 | - 15,000 |
| c) Less day care cost (annual) | - 1,300 |
| d) Custodial adjusted gross | $ 6,710 |
| e) Non-custodial gross (annual) | $37,960 |
| f) Total available gross 3(d) + 3(e) | $44,670 |
| g) Line 3(d) 6,710 Line 3(f) 44,670 | |
| h) 3(d) divided by 3(f) 15 per cent | |
| i) Adjustment for custodial income (Line 3h %) x (B) | (C) $ 30.00 |

4. Calculation of Final Order

| | | |
|---|---|---|
| a) Adjusted order (B) above | (B) | $197 |
| b) Less adjustment for income (C) above | (C) | - 30 |
| c) Less 50% of weekly cost of family group health insurance | | - 17 |
| Weekly Support Order (B) - (C) - 4(c) | | $150.00 |

arranging his financial affairs so as to conceal his assets and minimize his apparent income in order to avoid his child support obligations. Such a result would be unconscionable.

*Judgment affirmed.*

*Order denying motion to alter or amend judgment affirmed.*