## Amy E. Hunter vs. Miko Rose
### (and a companion case[1]).

Essex. May 8, 2012. - September 28, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, & Lenk, JJ.

*Domestic Partner. Marriage. Comity. Minor,* Custody. *Parent and Child,* Custody of minor. *Practice, Civil,* Attorney's fees. *Probate Court,* Custody of child, Attorney's fees.

In civil actions seeking custody of two children and equitable remedies, a Probate and Family Court judge correctly determined that a registered same-sex domestic partnership entered into in California was the equivalent of marriage in the Commonwealth and should be recognized under principles of comity, where California's domestic partnership law provided rights virtually identical to marriage, and where failing to recognize a domestic partnership in the circumstances of these actions would allow one domestic partner to avoid obligations such as child support; further, the judge did not err in determining that both parties were the legal parents of the children in question under either Massachusetts or California law. [492-494]

In civil actions brought by the plaintiff, who had entered into a registered same-sex domestic partnership with the defendant in California, a Probate and Family Court judge did not abuse her discretion in granting to the plaintiff primary physical custody of the biological child of the defendant, where the child had developed a strong emotional bond with the plaintiff, who was the child's legal parent under either Massachusetts or California law, during the child's first fifteen months of life; where the defendant wrongfully removed the child from the plaintiff when the defendant moved to Oregon, disrupting that attachment and, more likely than not, causing harm to the child; where the plaintiff was supportive of the child's relationship with the defendant and respected the defendant's role as the child's other parent; and where the plaintiff offered greater stability to the child. [494-499]

In civil actions in which the plaintiff, who had entered into a registered same-sex domestic partnership with the defendant in California, sought custody of two children and equitable remedies, a Probate and Family Court judge did not abuse her discretion in awarding attorney's fees and costs to the plaintiff, where the judge observed firsthand, for more than two years, the quality of the written submissions of the plaintiff's counsel as well as her motion practice and trial skills; where the plaintiff unnecessarily had been required to generate detailed and time-consuming legal work because of the defendant's refusal to recognize the plaintiff's legal parentage of the

---

[1]Involving the same parties.

defendant's biological child, which led to a trial over custody of that child; and where the equities of the parties' financial situation also favored the plaintiff; further, in awarding fees and costs, the judge did not punish the defendant for litigating a novel issue but, rather, was concerned about the defendant's inappropriate and obstructionist behavior. [499-503]

COMPLAINT for custody filed in the Essex Division of the Probate and Family Court Department on November 20, 2008.

COMPLAINT in equity filed in the Essex Division of the Probate and Family Court Department on December 12, 2008.

After consolidation, the cases were heard by *Mary McCaughley Manzi*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*John Foskett* (*Regina M. Hurley* with him) for the defendant.

*Karen L. Loewy* (*Patience W. Crozier* with her) for the plaintiff.

*Ilona M. Turner & Catherine P. Sakimura*, of California, & *Neil Jacobs, Mary J. Edwards, & Darren T. Griffis*, for Scott Altman & others, amici curiae, submitted a brief.

IRELAND, C.J. We granted an application for direct appellate review of the defendant, Miko Rose, to consider whether a judge in the Probate and Family Court erred when she recognized Rose's California-registered same-sex domestic partnership (RDP) with the plaintiff, Amy Hunter, as the equivalent of marriage in the Commonwealth; determined that both parties were the legal parents of the child each bore; and, after dissolving the RDP, awarded physical custody of the two children as well as certain attorney's fees to Hunter. Because parties to California RDPs have rights and responsibilities identical to those of marriage, pursuant to our recent decision in *Elia-Warnken* v. *Elia*, *ante* 29 (2012), the judge did not err in treating the parties' RDP as equivalent to marriage in the Commonwealth. We also conclude that the judge did not abuse her discretion in awarding physical custody of the children and attorney's fees to Hunter. Accordingly, we affirm.

*Facts and background.* We present the essential facts found by the judge in her extensive written findings, reserving details for our discussion of the issues raised.

Hunter and Rose began a dating relationship in Massachusetts in 2001. In the spring of 2002, they moved to California so that Rose could establish in-State residency and attend medical school. In the summer of 2003, the couple began to try to conceive a child; Hunter was the intended birth mother.

In September, 2003, the couple executed a declaration of domestic partnership that was registered in California in October, 2003. Important for our purposes is that, in September, 2003, the California Legislature amended its domestic partnership laws to grant same-sex domestic partners rights that are identical to those of marriage. 2003 Cal. Stat. 421, codified at Cal. Fam. Code § 297.5(a) (West Supp. 2012). The law applied retroactively to all RDPs that were not terminated prior to the statute's effective date of January 1, 2005. Cal. Fam. Code § 299.3 (West Supp. 2012). Hunter and Rose had notice of the change in the law; they did not dissolve their RDP, making them subject to the provisions of the 2003 statute.

In 2004, the couple bought a house. In 2006, after Hunter had several unsuccessful attempts to conceive a child that included undergoing medical procedures, the couple agreed that Rose would try to conceive. Her attempts were successful. While Rose was pregnant, the couple moved to Massachusetts, in part so that Hunter could obtain better health care coverage. Rose had obtained "medical rotations" on the east coast. Rose gave birth to a daughter, Jill,[2] in a hospital in Rhode Island in August, 2007.

Both women contributed to Jill's care. Because Hunter's work schedule was more flexible, she accommodated Rose's clinical rotations. In September and October, 2007, Hunter was Jill's primary caretaker; she took time off from work and worked from home to care for her. In January, 2008, Rose contacted an attorney to initiate Hunter's adoption of Jill and the couple began collecting supporting affidavits.

The couple also planned to have another child together. After several more fertility treatments, Hunter conceived a child in April, 2008, using the same sperm donor Rose had used. Shortly thereafter, the relationship between the couple deteriorated and

_____

[2]A pseudonym.

ended in August, 2008, although they continued to live together. Because of Rose's rotation schedule, after the breakup, Hunter had an even greater parenting role.

In October, 2008, Rose and Jill moved out of the home they shared with Hunter, who continued to coparent Jill. Rose notified Hunter that she was accepting a four- to six-week rotation in Oregon and was taking Jill with her. She deceived Hunter by assuring her that she and Jill would return in late November or early December, and that she would provide regular updates about Jill as well as utilize a "Web camera" so that Hunter could see Jill.

Instead, in November, 2008, Rose ceased all communication with Hunter. Rose canceled her cellular telephone service (and has never given Hunter her new telephone number), and did not respond to Hunter's attempts to communicate "with [Jill] by sending [her] packages . . . and home videos and [by] emailing and texting." Rose refused Christmas gifts Hunter sent to Jill. She also made decisions about Jill's daycare and living arrangements without notifying or consulting Hunter. Even after a temporary court order issued in February, 2009, allowed Hunter contact with Jill, Rose demanded that Hunter not refer to herself as "mommy." Rose also deliberately applied for medical rotations and clinical assignments to keep Jill as far away as possible from Hunter. In short, "she did everything she could to eradicate . . . Hunter from [Jill]'s life." In addition, after promising to proceed with Hunter's adoption of Jill, Rose ultimately refused to allow it. Rose denies that Hunter has a parental bond with Jill and would like any relationship Jill has with Hunter to cease.

At the end of November, 2008, Hunter filed a complaint for custody of Jill. In December, 2008, she filed an amended complaint in equity in which she sought sole physical custody of Jill and her unborn child, as well as a complaint for divorce.

Hunter gave birth to a daughter, Mia,[3] in January, 2009. Rose has provided "little to no" child care to Mia, admits that she does not love Mia, and does not want legal or physical custody of her. In addition, although Rose admitted in an answer to the

---

[3]A pseudonym.

complaint for custody that Hunter used the same sperm donor as she had, she denies that Jill and Mia are sisters, has actively discouraged any relationship between the girls, and wants Jill's existing relationship with Mia terminated.

Hunter's complaint for divorce was dismissed, the two remaining cases were consolidated, and a bench trial took place over several days in November, 2010, and January, 2011.

In her written decision, the judge made 726 enumerated findings of fact, further findings of fact, and 152 rulings of law. She dissolved the parties' RDP, declared that the parties were legal parents of both children, and granted sole legal and physical custody of Mia to Hunter (which Rose does not challenge) and joint legal custody of Jill with primary physical custody to Hunter. The judge set a parenting schedule of visitation between Rose and Jill. In a separate order the judge granted Hunter $180,000 in attorney's fees.

*Discussion.* 1. *Recognition of California domestic partnerships.*[4] Rose argues that the judge erred in determining that her California RDP was the equivalent of marriage in the Commonwealth and should be recognized under principles of comity. We considered the substance of Rose's arguments in our recent decision in *Elia-Warnken* v. *Elia, ante* 29, 32-35 (2012). Here, it suffices to say that, as the judge found, California's domestic partnership law provides virtually identical rights as marriage. See Cal. Fam. Code § 297.5(a) ("Registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law . . . as are granted to and imposed upon spouses").[5] Moreover, failing to recognize a domestic partnership here

---

[4] We acknowledge receipt of an amicus brief submitted in support of Hunter by eighteen California professors of family law.

[5] The fact that, on November 4, 2008, the voters of California voted to approve an initiative measure, Proposition 8, that amended art. 1 of the California Constitution by adding a new section (§ 7.5), stating that "Only marriage between a man and a woman is valid or recognized in California," does not affect the domestic partnership laws in California. See generally *Strauss* v. *Horton*, 46 Cal. App. 4th 364, 385, 470 (2009). The ballot initiative was designed to invalidate a decision of the Supreme Court of California holding that the right of same-sex couples to marry was protected by the California Constitution. See *Perry* v. *Brown*, 671 F.3d 1052. 1066 (9th Cir. 2012), quoting *In re Marriage Cases*, 43 Cal. 4th 757, 819, 829 (2008). Proposition 8

would allow Rose to avoid obligations such as child support. *Elia-Warnken* v. *Elia, supra* at 34, quoting Singer, Same-Sex Marriage, Full Faith and Credit, and the Evasion of Obligation, 1 Stan. J. C.R. & C.L. 1, 29, 36, 50 (2005) ("the 'needs of the interstate and international systems are better served by having a single clear answer to the validity of marriage,' because nonrecognition allows parties to avoid their obligations or leads to inconsistent legal obligations"). It also would harm Jill because a child's welfare is promoted by ensuring that she has two parents to provide, inter alia, financial and emotional support. See *Adoption of Mariano,* 77 Mass. App. Ct. 656, 661 (2010).

In addition, the judge did not err in determining that Hunter and Rose are the legal parents of both children under either Massachusetts or California law. Under Massachusetts law, children born into a legal spousal relationship are presumed to be the children of both spouses. G. L. c. 209C, § 6. Moreover, any child born as a result of artificial insemination with spousal consent is considered to be the child of the consenting spouse. G. L. c. 46, § 4B.

Although Rose does not assert that Hunter did not consent to Jill's conception, she claims that she did not consent to Mia's conception. The judge's conclusion that Rose consented to Mia's conception is fully supported in the record: in 2007, Rose signed three consent forms for one clinic[6] to administer artificial insemination to Hunter, and Rose provided blood for testing; after that attempt failed, Rose, among other things, accompanied Hunter to visits to another clinic and subsequent ultrasound and genetic counselling; she informed "others" that the plaintiff's pregnancy was "great news"; and she altered her rotation schedule to accommodate the pregnancy.[7]

Likewise, under California law, parties to an RDP are treated the same as spouses in determining the rights and obligations with respect to a child of either of them. Cal. Fam. Code

was declared unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. *Perry* v. *Brown, supra* at 1096.

[6]This fertility clinic appears to have been in Rhode Island.

[7]The fact that Hunter testified that Rose's support for her pregnancy "waned" in the summer of 2008, i.e., after Hunter conceived Mia, is not relevant to the issue whether Rose consented to Mia's conception.

§ 297.5(d). A nonbiological mother is presumed to be a child's parent if the child is born during the "marriage" or if, inter alia, she "receives the child into [her] home and openly holds out the child as [her] natural child." Cal. Fam. Code § 7611(a) & (d) (West Supp. 2012). See *Elisa B.* v. *Superior Court,* 37 Cal. 4th 108, 119-120 (2005), quoting *In re Salvador M.,* 111 Cal. App. 4th 1353, 1357 (2003) (marital terms referring to presumed father "apply equally to women seeking presumed mother status").[8] See generally *S.Y.* v. *S.B.,* 201 Cal. App. 4th 1023, 1025-1026 (2011) (although no marriage or registered domestic partnership, under Cal. Fam. Code § 7611[d], judge did not err in holding that former same-sex partner was presumed parent of adoptive mother's children). There was no error.

2. *Primary physical custody of Jill.* Parents have an equal right to custody of their children. See *Commonwealth* v. *Beals,* 405 Mass. 550, 554 (1989). "In custody matters, the touchstone inquiry [is] . . . what is 'best for the child'. . . ." *Custody of Kali,* 439 Mass. 834, 840 (2003). "The determination of which parent will promote a child's best interests rests within the discretion of the judge . . . [whose] findings . . . 'must stand unless they are plainly wrong.' " *Id.* at 845, quoting *Rosenberg* v. *Merida,* 428 Mass. 182, 191 (1998). However, the judge must weigh "all relevant factors in determining the best interests of the child." *Custody of Kali, supra,* quoting *Rosenberg* v. *Merida, supra.* The best interests of the child standard is applied in the context of the particular needs and circumstances of the child in question. See *Adoption of Vito,* 431 Mass. 550, 566 (2000), and cases cited. The judge shall consider "whether or not the child's present or past living conditions adversely affect his physical, mental, moral or emotional health." G. L. c. 208, § 31. Factors a judge may weigh are whether one parent's home is more stable in terms of a parent's work schedule, whether siblings are being raised together, and whether one parent seeks to undermine the relationship a child has with the other parent. See *Adoption of Kali, supra* at 843, 847 (stability and flexible work schedule); *Adoption of Hugo,* 428 Mass. 219, 230-231 (1998), cert. denied

---

[8]We need not address Rose's argument that, had Hunter wanted to establish legal parentage of Jill, she could have married Rose after they moved to Massachusetts or could have adopted Jill.

sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999) (sibling relationship); *Custody of Zia*, 50 Mass. App. Ct. 237, 244 (2000) (custody to parent willing to respect other parent's role in child's life); *Zatsky* v. *Zatsky*, 36 Mass. App. Ct. 7, 13 (1994) (custody based on parent's ability to subordinate her needs to those of children); *Haas* v. *Puchalski*, 9 Mass. App. Ct. 555, 557 (1980) (denial of custody where home was not "settled" and child would be cared for by multiple providers rather than parent). See generally *Williams* v. *Massa*, 431 Mass. 619, 623-624 (2000) (probate judge assessing and finding wife's efforts to disrupt husband's relationship with their children). The judge has discretion when awarding custody of a child to which we give "substantial deference." *Adoption of Hugo*, *supra* at 225, and cases cited.

Rose argues that the judge erred in granting primary physical custody of Jill to Hunter because, when the judge considered the best interests of the child, she ignored Rose's evidence that Jill is a well-adjusted, happy child, did not consider the harm that would befall Jill if the status quo were changed, and placed undue weight on Rose's conduct. She also alleges that there was an absence of evidence showing that Jill suffered harm by being removed from Hunter's care. The judge did not abuse her discretion.

Here, the judge found that Jill had developed a strong emotional bond with Hunter from Jill's birth until she was almost fifteen months old, after which Rose moved her to Oregon. Rose wrongfully removed Jill from Hunter when she moved to Oregon because Rose knew that Hunter was Jill's legal parent and, in doing so, disrupted Jill's attachment to Hunter.[9] See *Smith* v. *McDonald*, 458 Mass. 540, 546 & n.11 (2010), citing

---

[9]We agree with the judge that Rose's reliance on *Smith* v. *McDonald*, 458 Mass. 540 (2010), is not apt. In that case, the mother had a brief relationship with the father that resulted in the child's birth; there was no legal spousal relationship. *Id.* at 541. The father discovered that he was not listed on the child's birth certificate and sought to establish paternity, formalize child support, and establish rights to visitation and involvement in the child's life. *Id.* at 542. The mother moved out of the State with the child, which the judge found to be designed to deprive the father of a relationship with the child. *Id.* at 543. Because the father's paternity had not been established at the time the mother removed the child, the court held that she did nothing wrong. *Id.* at 545, 549-550. Here, in contrast, the parties were legally joined as spouses

G. L. c. 208, § 30 (divorced parent may not remove child from other parent without permission or court order). Jill "more likely than not" was harmed by Rose's actions, as evidenced by aggressive and "clingy" behaviors. The judge also found that Rose decided to move to Oregon and accepted employment in Michigan, to begin in July, "with little, if any, regard for [Jill's] basic and fundamental needs." Relying on the testimony of Hunter's expert, the judge listed the ways Rose's behavior exacerbated the harm to Jill, including failing to have a plan for maintaining Jill's ties to Hunter and Hunter's family (with whom Jill had formed attachments), and engaging in behaviors demonstrating an attempt to alienate Jill from Hunter, such as not allowing Jill contact with Hunter until ordered to do so by the court; telling Jill that Hunter was not her parent but a "friend," and referring to Hunter as "the person," "someone," or "Amy"; calling Hunter a "dickwad" in front of Jill; "specifically re-quest[ing] that [Mia] not be present" during Hunter's Web camera sessions with Jill; and asking the court to order that Hunter not refer to herself as "mommy" during those Web camera sessions.

The judge found that disrupting the attachment a child has to a parent and behaving in ways designed to alienate a child from that parent causes harm that can be long term, and if sole physical custody must be awarded because of geographic distance between parents, "it is in the best interests of a child to be in the sole custody of the parent who can support the involvement of both parents rather than with the parent who alienates the child from the other parent." Moreover, she found that Hunter was entirely supportive of Jill's relationship with Rose and respects Rose's role as Jill's other parent as demonstrated by the fact that, during her parenting time, she has Jill telephone Rose every night to say good night, refers to Rose as "Mommy Miko," and keeps a photograph of Rose in Jill's bedroom.

In addition to weighing these factors, the judge also assessed the stability each parent offered Jill, as well as the flexibility of each parent's job. She found that, after the move to Oregon, Jill lived in four different residences in less than one year and had

some four years before Jill was born and there was ample documentary evidence that, until the breakdown of the adult relationship, Rose considered Hunter to be Jill's legal parent.

"no less than five different care providers," and that the only
relative Rose had in Oregon, her mother, lived a three-hour
drive away. In addition, Rose accepted a residency in Michigan,
a State where she has no ties, and where, the judge found, her
employment was not "even [a] bona fide" career choice. The
judge found that a move to Michigan would put Jill "in an
unfamiliar environment with new caregivers and . . . medical
providers" while Rose worked "extraordinary long hours as a
medical resident for the next four years,"[10] and that Rose had
demonstrated that she cannot manage child care without
significant support.

By contrast, the judge found that Hunter "has a stable job as
an attorney in Massachusetts [that] provides flexibility by giv-
ing her the opportunity to work from home and to work flexible
hours," and therefore would be "far more accessible" to Jill
than would Rose. In addition, the judge found that only Hunter
was willing to foster the relationship that Jill has with Mia.

Despite Rose's assertion to the contrary, the judge's conclu-
sion that Jill would suffer substantial harm if she were to remain
in Rose's custody "[i]n light of [her] ongoing inability to put
[Jill's] needs above her own and the instability she has created
for [Jill] in terms of parentage, living circumstances and child
care, wrongful removal, [and] deceitful and alienating behavior"
has ample support in the record, and is based on more than
Jill's aggressive behavior.

There is no merit to Rose's claim that the judge ignored
evidence that Jill is happy and well adjusted. The judge explicitly
stated that she considered all of the evidence presented at trial
and "weighed and assessed [its] credibility." However, as the
finder of fact, she gave no credit to Rose's testimony that Jill
smiled and laughed more when she moved to Oregon, and found
that Rose's testimony "generally lacked credibility" because of
"numerous exaggerations, inaccuracies and contradictions."
The judge was entitled to credit Rose's statement, in electronic
mail messages to Hunter dated October 29 and November 1,
2008, describing Jill's aggressive and "clingy" behavior right

[10]In order to move to Oregon, Rose changed her career plan from family
practice to internal medicine. Rose did not inform the judge of the nature of
her residency in Michigan.

after the move to Oregon and to infer, based on the testimony of Hunter's expert, that such behavior continued at least during the time Rose denied Hunter further information about or contact with Jill until February, 2009.[11] Moreover, whether Jill is happy and well adjusted has no bearing on the judge's decision concerning custody where neither parent asserts that the other is unfit; where the judge found that, unlike Rose, Hunter was able to put Jill's needs above her own and "has managed to maintain a loving supportive relationship with [Jill] despite the distances" between them; and where the judge was required to grant sole physical custody to one parent because of geographical distance that, in this case, was deliberately created by Rose.[12] In addition, Rose's claims that the judge did not take into account the harm arising from separation from her and "disrupted [Jill's] attachment to [Rose]" have no merit. The judge's custody order gave Rose frequent contact with Jill, including parenting time

[11]We also note that the testimony of one of the witnesses for Rose, a family friend, provided further evidence supporting the judge's finding that Jill was harmed by the separation from Hunter. The witness stated that when Jill came back from visits with Hunter, she observed that on one occasion Jill had not gone directly to Rose; on two occasions Jill had cried on the way home from a visit; and, after a visit in November, 2009, when Jill was playing "she would stop and start to hit a doll on the table or . . . another toy[,] . . . had decreased ability to focus[, and] wasn't doing sustained play as much." We need not speculate concerning the reason Rose elicited this testimony, but point out that, as the expert stated, and the judge credited, a child can be "upset, angry, sad and aggressive" often at the parent who was left behind when a child was removed and that "parental alienating behaviors" can make a child angry and confused.

[12]We do not agree that the judge gave improper weight to Rose's behavior. The case on which Rose relies for support, *Haas* v. *Puchalski*, 9 Mass. App. Ct. 555 (1980), is not apt. In the *Haas* case, after an initial determination of custody in favor of the mother, the father sought and was granted custody solely because the mother took the child to Germany and Colorado without the father's consent. *Id.* at 555-556. The court stated that the judge made no findings of fact justifying the order changing custody from the mother to the father. *Id.* at 556-557. The court further stated that it was the welfare of the child that was paramount in determining custody, and custody proceedings were not a vehicle to punish the mother's behavior. *Id.* at 557, quoting *Heard* v. *Heard*, 323 Mass. 357, 377 (1948). Here, the judge's assessment of Rose's behavior was in the context of determining with which parent it was in Jill's best interest to live. See *Custody of Zia*, 50 Mass. App. Ct. 237, 244 (2000) (custody to parent willing to respect other parent's role in child's life). Given the judge's extensive findings, we also do not agree with Rose's assertion that the custody award was to punish her.

one weekend per month in Massachusetts, five weeks in the summer, school vacations, holidays, Web camera sessions three evenings per week, and telephone calls once per week. As discussed, the judge found that Hunter already has Jill telephone Rose every night to say good night. Moreover, the judge stated that, should Rose decide to move back to Massachusetts, the parties must work in good faith to adjust their parenting plan to meet Jill's best interests.[13]

There was no abuse of discretion in determining that primary physical custody of Jill should be with the plaintiff.

3. *Attorney's fees and costs.* Rose challenges the judge's award of $180,000 in attorney's fees and costs to Hunter.

An award of attorney's fees is in the sound discretion of the judge, and will not be disturbed unless there is an abuse of discretion. *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 38-39 (2002), and cases cited. *Smith* v. *Smith*, 361 Mass. 733, 738 (1972), quoting *Old Colony Trust Co.* v. *Third Universalist Soc'y of Cambridge*, 285 Mass. 146, 151 (1934) ("the award . . . may be presumed to be right and ordinarily ought not to be disturbed"). When awarding fees, "a judge may consider[, inter alia,] the amount of time required to prepare the case and pleadings, the complexity of issues involved, the value of the marital property, and the [spouses'] ability to pay." *DeMatteo* v. *DeMatteo*, *supra* at 39. A fundamental principle governing the issue of awarding attorney's fees in domestic relations cases is that they are to be "awarded on 'strictly conservative principles.' " *Hayden* v. *Hayden*, 326 Mass. 587, 596 (1950), quoting *Commissioner of Banks, petitioner, in re Prudential Trust Co.*, 240 Mass. 478, 485 (1922).

In the judge's written judgments of custody and dissolution, entered on April 20, 2011, she reserved the issue of attorney's fees, stating that, if a party requested fees, detailed affidavits would be required and "the issue [would] be determined on the pleadings, so as to avoid further costs to either party." Hunter filed an amended motion for attorney's fees and costs, together with an affidavit of her attorney in support thereof. Rose filed

---

[13]We agree with Hunter that, in asserting that the judge ignored harm to Jill if Hunter is granted custody, Rose misuses the testimony of Hunter's expert, who addressed a complete severing of parental attachment and alienation.

an opposition to this motion and requested an evidentiary hearing. The judge declined to hold an evidentiary hearing, stating that she intended to "prevent proceedings on potential cross motions for fees from 'deteriorat[ing] into ancillary major litigation.' " See *Robbins* v. *Robbins*, 19 Mass. App. Ct. 538, 543 n.10, 544 (1985), *S.C.*, 22 Mass. App. Ct. 982 (1986) (where judge has firsthand knowledge of work performed and of going rates, evidentiary hearing may not be necessary).

In order to provide context to the judge's written decision on the motion for attorney's fees, we note that, in March, 2009, a single justice of the Appeals Court affirmed a decision of a judge in the Probate and Family Court (not the trial judge) that concluded that the parties' RDP was a legal spousal relationship, and that ordered, among other things, visitation between Hunter and Jill. In September, 2009, the trial judge also entered a pretrial ruling dated August 10, 2009, that, under California law, the parties were both legal parents of both children, and that the relationship would be recognized under principles of comity. Nevertheless, a significant part of discovery and the trial was devoted to proving that Hunter and Rose were legal spouses and Jill's parents under California law. It also is important to note that, in the judge's earlier written findings of fact and conclusions of law, her recitation of the procedural history in the case constituted 102 numbered paragraphs, seventeen of which had subparagraphs.

The judge entered her written decision on Hunter's motion for attorney's fees on May 31, 2011. She credited the affidavit of Hunter's attorney, stating that the legal work created by Rose's "refusal to recognize the legal parentage of [Hunter was] detailed thoroughly and accurately in [counsel's] twelve page affidavit." Hunter had requested her total fees and costs of over $369,000 or, in the alternative, $245,250 of fees and costs incurred since August of 2009, when the trial judge determined that both parties were legal parents of Jill. The judge ordered that Rose was responsible for $180,000 of Hunter's attorney's fees and costs, payable in six annual instalments of $30,000.

The judge based her decision on three factors. First, she observed firsthand, for more than two years, the quality of the written submissions of Hunter's counsel, as well as her motion

practice and trial skills, which the judge found to be "highly competent." She also determined that the hourly rates, outlined in the affidavit, were "wholly reasonable."[14]

Second, the judge found that Hunter was unnecessarily required to generate detailed and time consuming legal work because of Rose's refusal to recognize Hunter's legal parentage of Jill, which also led to the necessity of a trial over custody of Jill. For example, during discovery, Rose routinely failed to respond in a timely manner, failed to produce documents in her possession, refused to sign releases so Hunter could obtain evidence from third parties (even though Rose had agreed to give her consent), resisted cooperating, and ignored court orders.[15] Rose destroyed key evidence in anticipation of litigation,[16] filed a motion to amend her answer to withdraw her admission that Jill and Mia had been conceived using the same sperm donor, and unilaterally changed the public docket in the case without notice to or agreement from Hunter. The judge's finding that "[c]learly [Hunter] was assigned the laboring oar by [Rose]" is supported by the record.

Third, the judge addressed and assessed the financial situation of each party. See *DeMatteo* v. *DeMatteo, supra* at 39, citing *Goldman* v. *Roderiques*, 370 Mass. 435, 437 (1976) (in making award of attorney's fees, "the basic factors of need and relative economic positions of the spouses" must be considered). The judge found that Hunter had been able to pay only $50,064

---

[14]Rose argues only that no fees should have been awarded; she does not contest the amount of fees that were awarded.

[15]Rose's refusal to cooperate consisted, in part, of Rose and her attorney sending hostile letters to Hunter, noting that counsel did not care about preserving resources, denying Hunter had any relationship with Jill, and refusing to negotiate on parenting time or issues even after the judge's August, 2009, ruling on parentage. Rose also refused to alter or increase Hunter's parenting time with Jill, requiring Hunter to bring motions before the court.

[16]The judge found that, by August of 2008, when her relationship with Hunter ended, Rose was aware that there could be legal action concerning Jill, other than adoption proceedings. On the night before she left for Oregon, with the help of her best friend, Rose burned all of the journals she had kept that contained writings from the time of her relationship with Hunter. Rose purposefully destroyed these lengthy contemporaneous writings about her eight-year relationship with Hunter, and because Rose knew litigation was likely, she felt threatened with court action and was worried about a court order keeping her in Massachusetts.

over two and one-half years toward her total legal fees and was paying $500 each month toward the balance due. She found that, by choosing to forgo the residency position in Michigan, Rose was voluntarily and avoidably unemployed, but was under less financial strain than Hunter, and had the financial support of her family.[17]

Rose argues that the fee award penalizes her for having litigated the novel issue whether Hunter's status as a registered domestic partner in California gives her legal parental rights in Massachusetts as to Jill, and for having taken the issue of Jill's custody to trial. She argues that, because the court's rulings concerning legal parentage were preliminary, interlocutory, and nondispositive, she was not prolonging litigation or making frivolous arguments, but rather properly arguing a previously undecided issue. She also states that it was "egregious" for the court to "penalize [her] for resisting an effort to wrest her daughter from her custody" by taking the issue to trial.

We conclude that the trial judge was not penalizing Rose for litigating a novel issue. Rather, she properly was concerned about Rose's inappropriate and obstructionist behavior, set forth above, from the time the judge ordered that both parties were Jill's legal parents until the end of the trial over custody. Fee awards are proper given a party's discovery abuses, obstructionist conduct, and delay tactics. See *J.S.* v. *C.C.*, 454 Mass. 652, 666 (2009) ("a fee award was justified because the litigation was 'unnecessarily complicated and prolonged' by the actions of [one of the parties, inter alia,] by [that party's] conduct during discovery"). We understand the judge's statements concerning Rose's refusal to concede Hunter's legal parentage and forcing a trial as a reference to the fact that Rose refused to acknowledge that there was a legal relationship under *California* law. Rose could have conceded these facts and still preserved her right to appeal the actual "novel" issue, whether the Commonwealth would recognize California law under principles of comity.

[17]Rose withdrew and kept all of the couple's funds from their joint bank account, totaling $18,000. Rose also sold the couple's joint home and kept the proceeds. Rose's legal fees have been paid in part by her mother and her mother's friend, totaling at least $103,000, and her mother testified that she would help her daughter continue to pay additional legal fees.

Finally, Rose claims that the judge erred by characterizing her as "voluntarily unemployed." She argues that she gave up the residency in Michigan because the judge ordered Jill's relocation to Massachusetts. The judge's order did not require Rose to relocate with Jill. Therefore, the judge was within her discretion to determine Rose's unemployment at the time of the fee assessment was voluntary and avoidable. See *DeMatteo* v. *DeMatteo, supra.*

The judge did not abuse her discretion in awarding $180,000 in attorney's fees and costs to Hunter.

*Conclusion.* For the reasons set forth above, we affirm the judgments of custody and dissolution of the parties' RDP, as well as the award of attorney's fees to Hunter.

*So ordered.*