NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-498

STEPHANIE A. HOWARD

vs.

DAVID W. HOWARD.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

David W. Howard (father), the former spouse of Stephanie A. Howard (mother), appeals from a judgment of divorce nisi (divorce judgment) issued by a judge of the Probate and Family Court, claiming error in the judge's determinations of custody (both legal and physical) and child support.  The father also appeals from an order issued by a single justice of this court on May 25, 2023, denying the father's motion to stay the divorce judgment.[1]  We affirm.

---

[1] The father filed additional notices of appeal, from (1) a judgment of contempt and several orders dated September 28, 2022, and (2) an order dated April 6, 2023, issued by a different Probate and Family Court judge denying the father's motion to stay the divorce judgment.  The September 28, 2022 orders were subsumed by the contempt and divorce judgments and are not separately appealable (nor did the father set forth any

Background.  We summarize the trial judge's relevant
findings, supplementing them with undisputed facts in the
record, and reserving other facts for later discussion.  See
Pierce v. Pierce, 455 Mass. 286, 288 (2009).

The parties were married in 2004.  Four children were born
of the marriage:  two sons and two daughters.  Both parties
worked full time during the early years of the marriage;
however, the mother reduced her hours after the birth of the
first child and, shortly before the birth of the second child,
she left her job to care for the children full time.  The
father, a mechanical engineer, worked for a company until late
2016, when he started his own firm.  Though the firm was
successful during the first few years, with the father earning
in excess of $200,000 annually, its revenues began to decline
after the mother commenced divorce proceedings in February 2019.

1.  The divorce proceedings.  The father's reaction to the
mother filing for divorce was "nuclear."  He became "hostile,"
"nasty," and "abusive" in his communications with the mother,
and he insisted on immediately having equal parenting time with

argument in his brief regarding those orders).  Moreover, the
father did not set forth any argument in his brief regarding the
contempt judgment or April 6, 2023 order (nor did he provide
copies of them in the record appendix); accordingly, we do not
consider them.  See Mass. R. A. P. 16 (a) (9) (A), as appearing
in 481 Mass. 1628 (2019); Board of Registration in Med. v. Doe,
457 Mass. 738, 743 n.12 (2010).

2

the children, despite that the mother had been the children's primary caregiver since birth.

After the mother filed for divorce, both parties initially remained living in the marital home with the children.  In September 2019, the judge issued a temporary order incorporating the parties' agreement for temporary shared legal and physical custody, which allotted relatively equal parenting time to them.[2] The father, however, refused to comply with the temporary parenting schedule and failed to shield the children from his anger toward the mother.  During a confrontation in January 2020, the father threatened the mother that their next confrontation would become "physical."  The mother thereafter obtained a G. L. c. 209A abuse prevention order against the father (which was extended for one year) and moved out of the marital home.

As the divorce litigation progressed, the boys' previously "very close" relationship with the mother deteriorated.  The boys became increasingly hostile and combative toward the

_____

[2] The temporary parenting schedule provided that the children would (1) be in the mother's care from Monday morning until Wednesday afternoon, (2) in the father's care from Wednesday afternoon until Friday morning, and (3) spend alternating weekends in each parent's care.  It was later adjusted (in a 2020 temporary order) to a "two-week" rotating schedule, with the father having slightly less parenting time than the mother (the children would be in the father's care from Thursday afternoon to Sunday afternoon on "week 1," and from Wednesday afternoon to Friday morning on "week 2").

mother, and both expressed their desire to spend less time with her and more time with the father. On several occasions, the father did not produce the boys for their scheduled parenting time with the mother, sometimes claiming that the boys refused to see her and that he would not force them to do so. The discord between the boys and the mother reached an apex in January 2022, when the father was jailed for contempt based on his failure to pay child support. On learning of the father's incarceration, the eldest son (who was fifteen at the time) became enraged and verbally abusive toward the mother. After the father was released from jail, the children visited him at his home. When the mother came to pick the children up, the boys were "extremely angry" with her. When they returned to her home, the younger son (who was fourteen at the time) yelled and verbally abused her while backing her into the kitchen counter. The incident frightened the mother, and she was concerned about exposing the girls to similar incidents in the future, so she returned the boys to the father's house and had little parenting time with them in the following months leading up to trial.

2. The trial and divorce judgment. Approximately three months later, in May 2022, a two-day trial was held. Two of the major disputed issues at trial were custody (both legal and physical) and the father's income for purposes of calculating child support. With respect to custody, the father proposed

4

that the parties be granted shared legal custody and shared physical custody of all four children but that he be granted primary physical custody of the boys. He asserted that the boys' relationship with the mother deteriorated because of his incarceration, and that the last time they were in the mother's care, the environment was "unsafe." The judge disagreed and found that the boys' animosity toward the mother had been fueled by the father expressing his anger about her to the boys and "embroil[ing]" them in the conflict between the parties. The judge concluded that the father had "intentionally interfer[ed] with [the] mother's relationship with [the boys]." The judge further found that, throughout the litigation, the father "refused to communicate respectfully and cooperatively about the children" with the mother. The judge ultimately granted primary physical custody of the girls to the mother, shared physical custody of the boys to both parents, and sole legal custody and decision-making authority for all four children to the mother.

With respect to determining the father's income for purposes of calculating child support, the father claimed that his income from his firm had drastically declined through no fault of his own, due in part to the COVID-19 pandemic, decreasing from approximately $235,000 in 2018 to less than $100,000 by 2020 (as reported on his tax returns for those years). At the time of the May 2022 trial, the father had not

5

yet filed his 2021 tax returns. The father proposed that the judge calculate child support using an annual income for him of $100,000. The judge, however, did not find the father credible regarding his income. She ultimately concluded that he was voluntarily underemployed, attributed an annual income to him of $165,000, and ordered him to pay child support of $655 per week.

The father appealed, challenging the aspects of the divorce judgment pertaining to custody and child support. We address his contentions in turn.

Discussion. 1. Custody. The father contends that the judge committed reversible error by granting the mother sole legal custody of all four children, and by granting the parties joint physical custody of the boys while allowing the mother to retain sole decision-making authority.

As an initial matter, we address the father's contention that by vesting sole legal custody (and thus sole decision-making authority) in the mother, the judge effectively granted the mother sole physical custody of the boys because she retains decision-making authority when they are in the father's care. "[C]ustody is divisible into two components:" (1) "legal custody," and (2) "physical custody." Mason v. Coleman, 447 Mass. 177, 181 (2006). See G. L. c. 208, § 31. Legal custody involves making "major decisions regarding the child's welfare including matters of education, medical care and emotional,

moral and religious development."  G. L. c. 208, § 31 ("Sole

legal custody" vests decision-making authority in one parent;

"[s]hared legal custody" requires "continued mutual

responsibility and involvement by both parents in major

decisions").  Physical custody, by contrast, pertains to

parenting time; that is, how much time the child is in each

parent's care.  G. L. c. 208, § 31 ("Sole physical custody"

defined as child "resid[ing] with and be[ing] under the

supervision of one parent, subject to reasonable visitation by

the other parent; "[s]hared physical custody" defined as child

"hav[ing] periods of residing with and being under the

supervision of each parent . . . in such a way as to assure a

child frequent and continued contact with both parents").  See

Mason, supra at 181-182.

Here, the father was granted equal parenting time pursuant

to a schedule that ensured frequent and continued contact with

the boys, consistent with the statutory definition of "[s]hared

physical custody."  G. L. c. 208, § 31.  Moreover, while the

custody arrangement in this case was perhaps less common than

other custody arrangements, our courts have affirmed the grant

of sole legal custody to one parent where the parents have

shared physical custody.  See, e.g., Malachi M. v. Quintina Q.,

483 Mass. 725, 731, 741 (2019); Custody of a Minor (No. 1), 21

Mass. App. Ct. 985, 987 (1986) ("mother has been granted joint

physical custody . . . to satisfy her important interests in sharing the child's time and in exercising her responsibility for the child's upbringing. In view of the antagonism presently existing between the parents, it was not unreasonable" to grant father sole legal custody). Accordingly, we do not agree with the father's assertion that the grant of shared physical custody was illusory.

We next turn to the father's claim that the judge's determinations as to legal and physical custody amounted to reversible error. We review custody determinations for an abuse of discretion. Schechter v. Schechter, 88 Mass. App. Ct. 239, 245 (2015). "In custody matters, the touchstone inquiry [is] . . . what is 'best for the child.'" Hunter v. Rose, 463 Mass. 488, 494 (2012), quoting Custody of Kali, 439 Mass. 834, 840 (2003). "In making an order or judgment relative to the custody of children, the rights of the parents shall, in the absence of misconduct, be held to be equal, and the happiness and welfare of the children shall determine their custody." G. L. c. 208, § 31. "When considering the happiness and welfare of the child, the court shall consider whether or not the child's present or past living conditions adversely affect his physical, mental, moral or emotional health." Id. "The determination of which parent will promote a child's best interests rests within the discretion of the judge . . . [whose] findings . . . 'must stand

8

unless they are plainly wrong.'" Hunter, supra, quoting Custody of Kali, supra at 845.

a. Legal custody. In granting the mother sole legal custody, the judge cited the father's "inability to communicate civilly and effectively" with the mother. The father asserts that the judge, in essence, deprived him of shared legal custody to "punish" him for being "uncivil." We disagree.

"[F]or joint custody or shared responsibility to work, both parents must be able mutually to agree on the basic issues in child rearing and want to cooperate in making decisions for [their] children." Macri v. Macri, 96 Mass. App. Ct. 362, 369 (2019), quoting Rolde v. Rolde, 12 Mass. App. Ct. 398, 404 (1981). Joint legal custody is not appropriate where "the relationship of the parties has been dysfunctional, virtually nonexistent, and one of continuous conflict." Carr v. Carr, 44 Mass. App. Ct. 924, 925 (1998), cert. denied, 525 U.S. 1073 (1999).

Here, the judge found that the father had demonstrated an unwillingness "to communicate respectfully and cooperatively about the children" with the mother, sending her "abusive, disrespectful" messages, refusing to discuss various matters pertaining to the children (including their schedules, activities, and medical care), and making unilateral decisions regarding the children over the mother's objection. The judge

9

found, among other things, that the father (1) called the mother a "disgusting sad excuse for a human being" and berated her for not immediately receiving a job offer after being out of the workforce for over a decade to raise the children; (2) unilaterally signed the younger son up for club hockey over the mother's objection; (3) refused to consent to (or even discuss with the mother) the girls receiving COVID-19 vaccinations as recommended by their pediatrician;[3] (4) refused to answer the mother when she asked if he was planning to buy one of the girls a cell phone, stating that it was "[n]one of [her] business"; (5) refused to tell the mother whether he intended to pick the elder son up from school when he became ill during the school day, informing the mother that it was "[n]ot [her] concern"; and (6) refused to discuss the holiday parenting schedule with the mother.[4]

---

[3] The father claims that the judge erroneously found that he refused to consent to the girls receiving COVID-19 vaccines against the advice of their pediatrician. He asserts that his unrebutted testimony demonstrated that the pediatrician spoke to him over the phone and admitted that the vaccine was not necessary. The judge, however, did not credit this testimony. See Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995).

[4] The record revealed additional instances of the father's unilateral decision-making and refusal to communicate with the mother regarding the children's welfare. For example, the father (1) unilaterally canceled a family therapy appointment that the boys were supposed to attend with the mother, so that the boys could get haircuts instead; (2) unilaterally canceled one of the children's orthodontist appointments, over the mother's objection; and (3) ignored the mother when she repeatedly asked him whether he planned to pick up one of the

Contrary to the father's assertion, these findings were well supported by the evidence at trial. The judge's findings, and the evidence supporting those findings, clearly demonstrated that shared legal custody would be unworkable in this case given the parties' dysfunctional, high-conflict relationship, rendering them unable to communicate effectively or cooperatively to engage in joint decision-making regarding the children. See Imbrie v. Imbrie, 102 Mass. App. Ct. 557, 571 (2023) ("it is generally inappropriate to grant shared legal custody to parents who display a high level of acrimony that impedes their ability to jointly make decisions about the children's welfare"). The judge properly determined that shared legal custody was not feasible in this case. See O'Connell v. Greenwood, 59 Mass. App. Ct. 147, 155-156 (2003) ("in the face of overwhelming undisputed evidence of hostility between the parents and their disagreement on matters pertaining to the child[ren], the child[ren]'s best interests . . . are likely better served by ending the joint custodial arrangement," rather than "forcing the parties into a cooperative relationship they appear incapable of maintaining" [quotation and citation omitted]).

---

children's medications (which the child was supposed to take during the father's parenting time).

11

The judge, therefore, was tasked with determining which parent would be more capable of making decisions in furtherance of the children's best interests.  See Hunter, 463 Mass. at 494. Implicit in the judge's findings is her determination that, of the two parents, the mother was more capable of separating her own needs from those of the children in order to make decisions that promoted their best interests.[5]  In light of the father's pattern of refusing to discuss matters regarding the children's welfare with the mother, his unilateral decision-making without regard for the mother's input, and his general hostility when communicating with the mother, we cannot say the judge abused her discretion in granting the mother sole legal custody.  See id.  See also Macri, 96 Mass. App. Ct. at 369-370 (affirming grant of sole legal custody to mother where parties continuously had conflict, were unable to communicate effectively, and father engaged in unilateral decision-making over mother's objection demonstrating his inability to put children's needs first).

b.  Physical custody.  In granting the parties shared physical custody of the boys, the father asserts that the judge failed to consider certain factors pertinent to the best interest determination, including the boys' "need for stability,

---

[5] The judge found that the father had "exhibited absolutely no ability to separate his feelings and needs from the needs and feelings of the children."

12

the effect of their strained relationship with [the] [m]other, and their right to the care and custody of the parent they preferred" (i.e., the father).[6]  He also claims certain findings made by the judge were erroneous, and that he ultimately "lost custody" of the boys because he refused to "bully [them] into a relationship they did not want" with the mother.  We are not persuaded.

In determining the boys' best interests, the judge was permitted to "consider the widest range of permissible evidence, including the reports and testimony of [the] court appointed [Guardian Ad Litem (GAL)[7]], evidence of the history of the relationship between the child and each parent, [and] evidence of each parent's . . . over-all fitness to further the child's best interests."  Ardizoni v. Raymond, 40 Mass. App. Ct. 734, 738 (1996).  Moreover, the judge was permitted to consider the

---

[6] The father also contends that reversal is required because the judge failed to consider certain factors required by G. L. c. 209C, § 10 (a); however, that statute only applies to custody proceedings involving children born to unmarried parents (it does not apply to custody determinations involving children of divorcing parents).  Compare G. L. c. 208, § 31 (custody of children born to married parents), with G. L. c. 209C, § 10 (custody of children born to unmarried parents).

[7] In this case a licensed psychologist was appointed as a "Category E" GAL to report and make recommendations as to the issues of custody, parenting time, and parental alienation.  See Imbrie, 102 Mass. App. Ct. at 561 n.5 ("In addition to investigating and reporting factual data to the court, a Category E GAL develops clinical opinions to assist the judge . . . in making custody and visitation decisions").

13

boys' "expressions of a preference" regarding custody, with the caveat that such preference "'must be treated with caution,' particularly where, as here, custody is hotly disputed." Id., quoting Hale v. Hale, 12 Mass. App. Ct. 812, 820 (1981).

The father contends that the judge failed to adequately consider the boys' need for stability and their preferences regarding custody. With respect to the boys' need for stability, the shared parenting plan set forth in the divorce judgment granted each party essentially the same amount of parenting time as the temporary parenting plans issued during the pendency of the divorce proceedings (including the temporary parenting plan agreed on by the parties in September 2019). The judge expressly chose to not alter the existing shared physical custody framework for the boys (apart from slightly increasing the amount of parenting time allotted to the father under the 2020 temporary order), because the boys had become "so polarized that it would be . . . difficult to imagine them being comfortable with anything less than shared physical custody which, in fact, the boys have told numerous third parties [including the GAL] they are seeking." It is apparent from the judge's findings and rationale that she was inclined to grant primary physical custody of the boys to the mother but for their expressed opposition to such an arrangement. As such, contrary

14

to the father's assertion, the judge did indeed consider the boys' preferences regarding custody.

The father, however, claims that the judge ignored the boys' "choice [to] reside[] primarily with [him]" after their relationship with the mother deteriorated.  Once again, we disagree.  The judge's findings reflect careful consideration of the boys' resistance to spending time with the mother, along with the circumstances surrounding the deterioration of their relationship with her, and she appropriately "treated with caution" their expressions of desire to spend more time in the father's care.  Ardizoni, 40 Mass. App. Ct. at 738, quoting Hale, 12 Mass. App. Ct. at 820.  See Bak v. Bak, 24 Mass. App. Ct. 608, 617 (1987) (judge may consider child's preference regarding custody, but it should "not [be] given decisive weight").  The judge found that the father had "intentionally interfere[ed]" with the boys' relationship with the mother and had failed to exercise his parental authority to ensure that they attended their scheduled parenting time with her.  The father claims this finding is clearly erroneous,[8] pointing to the

---

[8] The father also claims error in the judge's finding that the father offered no testimony that he found the boys' behavior toward the mother unacceptable.  The father asserts that he testified that he was "appalled" on learning of the boys' behavior.  However, he made that statement after the close of evidence, during a colloquy with the judge where she asked if he was concerned about the boys' behavior.  Accordingly, the

15

GAL's testimony that he did not find evidence of parental alienation by the father. The GAL, however, testified that while he did not "find a parental . . . alienation syndrome," there "were elements that contribute to alienation." The GAL further testified that the father had inadequately protected the children from his anger and resentment toward the mother, failed to use his parental authority to stop the boys' disrespectful behavior toward the mother, and failed to support a positive relationship between the boys and the mother, which the judge apparently credited. Accordingly, we cannot say the judge's finding that the father interfered in the boys' relationship with the mother was clearly erroneous.

The father next asserts that the shared parenting plan ordered by the judge is "almost certain to prove chaotic," and that the boys' best interests require that sole physical custody be granted to the father -- even if it "result[s] in [the] [m]other's 'severance' from the boys." Again we are not persuaded. The difficulty posed by the boys' resistance to spending time with the mother -- which the judge found that the father encouraged -- neither makes an order for joint physical custody fruitless nor warrants the exclusion of the mother from the boys' lives (especially where she was their primary

judge's finding that the father "offered [no] testimony" on this point is not clearly erroneous.

16

caregiver up until the divorce proceedings). See McCarthy v. McCarthy, 21 Mass. App. Ct. 924, 924 (1985) ("Tentative results in difficult [custody] cases . . . do not excuse effort"). "Here, the judge's obligation was clear: to craft a creative [parenting plan]," in the children's best interests, by "drawing on the evaluations and recommendations of the professionals and [the judge's] own insight, experience and knowledge." Id. The judge found that the father had "exhibited absolutely no insight into his own behavior and the damage that it has caused the children by placing them in the middle of the parties' conflict."[9] The judge concluded that the father had "no ability to promote a relationship between the children and [the] mother," but also acknowledged the reality that the boys would be opposed to "anything less than shared physical custody." The judge carefully considered and weighed all relevant factors in arriving at a determination that the boys' best interests would be served by a shared parenting plan that ensured continued and frequent contact with both parents. See G. L. c. 208, § 31.

We are satisfied that the judge properly applied the law, considered all factors relevant to the children's best

---

[9] The judge found that the mother had also put the children in between the parties and made derogatory statements about the father, but that this had occurred on "limited" occasions and only "in response to tremendous stress caused by the father's unrelenting behavior."

17

interests, and made findings of fact (which were not contrary to the evidence) that provided ample support for her custody determinations.  Accordingly, based on the record before us, we discern no abuse of discretion in the judge's determinations of both legal and physical custody.  Schechter, 88 Mass. App. Ct. at 245, 260.

2.  Child support.  The father next contends that the judge abused her discretion in attributing annual income to him of $165,000 for purposes of calculating child support.

A judge's decision to attribute income to a party is reviewed for an abuse of discretion.  Davae v. Davae, 100 Mass. App. Ct. 54, 57 (2021).  "Income may be attributed where a finding has been made that either parent is capable of working and is . . . underemployed," and that parent "is earning less than he or she could earn through reasonable effort."  Child Support Guidelines § I (E) (1)-(2) (Oct. 2021).  In deciding whether to attribute income to a parent, the judge must consider "the specific circumstances of the parent, to the extent known and presented to the [judge], including, but not limited to,

> "the assets, residence, education, training, job skills, . . . age, health, past employment and earnings history, . . . record of seeking work, and the availability of employment at the attributed income level, the availability of employers willing to hire the parent, and the relevant prevailing earnings level in the local community" (emphasis added).  Child Support Guidelines § I (E) (3) (Oct. 2021).

18

Here, the judge's findings reflect consideration of the aforementioned factors that were presented to her at trial (along with other relevant factors), including the father's (1) degrees in mechanical engineering and management; (2) employment history earning approximately $150,000 per year, prior to starting his own firm in late 2016; (3) earnings from his firm averaging over $200,000 annually from 2017 to 2019, and the rapid decline in the firm's revenues after the mother filed for divorce;[10] (4) decision not to seek alternative employment after the firm's revenue decline, instead "cho[osing] to build the company . . . back up"; and (5) failure to file his 2021 tax returns prior to the May 2022 trial.

The judge found the father's testimony regarding his finances to lack credibility. The judge concluded that the father was voluntarily underemployed, as he had not looked for other work despite his claim that the firm had been experiencing significant, ongoing revenue decline for three years. See Macri, 96 Mass. App. Ct. at 365 (attributing income to husband

---

[10] In 2017 and 2018, the father earned an average of $234,000 per year in combined W-2 and K-1 income from his firm. In 2019, the year that the mother filed for divorce, the father's total income from the firm declined by approximately seventeen percent, to $194,443. In 2020, the first year of the COVID-19 pandemic, the father's income from the firm, as reported on his 2020 tax returns, declined by approximately fifty percent, to $95,655.

who had "not exercised reasonable efforts to secure appropriate employment"). The judge noted the father's contradictory testimony that he was optimistic about the firm's future and that he had been "quite busy" with work over the past few months, finding that the father would resume his historical predivorce earning level with the firm following the divorce. The judge also found that the father had artificially reduced his income by recording his divorce legal fees as business expenses[11] and by using assets to remain current on his bills (except for child support) rather than working.[12] The judge concluded that, "[g]iven [the father's] earning history of over $200,000.00 annually prior to the filing of the divorce, the attribution of $165,000.00 is more than reasonable."

The father contends that the judge's attribution of income was "contradicted by all evidence at trial," which evidence consisted almost entirely of his own testimony. He asserts that the judge improperly refused without explanation to credit any

---

[11] The father testified that he has total control over how he is paid, and that he stopped issuing himself regular paychecks because he had legal fees to pay.

[12] Notably, despite his allegation of substantially decreased income due to the COVID-19 pandemic and his use of assets to meet his expenses, the father's net worth (i.e., assets minus liabilities) actually increased between mid 2020 ($914,194.03, as reported on his June 2020 financial statement) and the trial in 2022 ($977,006.31, as reported on his May 2022 financial statement).

of his testimony regarding his income and the effect of the COVID-19 pandemic on his business.[13]  He also contends that the judge unfairly drew an adverse inference regarding his 2021 income based on his accountant's failure to file the father's 2021 tax returns.  The father's contentions are, in essence, a challenge to the judge's assessment of his credibility, which we do not disturb on appeal.  See Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995) (judge's credibility determination "close to immune from reversal on appeal except on the most compelling of showings").  The judge was entitled to draw adverse inferences based on the father's failure to file his 2021 tax returns before the trial,[14] his vague testimony regarding his 2021 earnings,[15] and his failure to produce

---

[13] This evidence included the father's testimony that the firm's revenues had sharply declined in 2020 because of the COVID-19 pandemic, which he claims was corroborated by the testimony of a witness (who runs a forensic engineering business similar to the father's own firm).  However, when the witness testified that his business suffered a decline in revenue because of the COVID-19 pandemic, the mother's counsel objected, the objection was sustained, and the testimony was struck.

[14] The judge was not required to credit the father's testimony that the delay was his accountant's choice rather than his own.

[15] The father contends that the judge erroneously found he testified to having "no idea" how much he earned in 2021.  The father is correct insofar as his actual testimony was that he had no idea what he owed in taxes for 2021, but the judge certainly could have found that the father was unable clearly to explain his idea of how much he earned in 2021.  At one point during the trial, the father testified that he earned $47,015 in 2021.  When the judge asked, "[W]here did you get that $47,000

21

documentary evidence (such as bank statements) of the firm's finances for 2021 and the first quarter of 2022 (despite his testimony that business was picking up).[16]  See M.C. v. T.K. 463 Mass. 226, 240 & n.16 (2012) ("In the absence of tax returns, the judge appropriately could draw inferences adverse to the father and impute net income based on evidence in the record"); Salten v. Ackerman, 64 Mass. App. Ct. 868, 872-873 (2005) (judge entitled to draw adverse inferences in light of husband's "failure to provide sufficient information" about income, "evasiveness as to the finances of the partnership and his lack of credibility"); Crowe v. Fong, 45 Mass. App. Ct. 673, 679 (1998) (judge entitled to draw adverse inferences from father's failure to produce financial documents within his control and "uncertainties surrounding his financial affairs"); Grubert v. Grubert, 20 Mass. App. Ct. 811, 821-822 (1985) (adverse inference permissible where "the uncertainty surrounding the

---

figure from," the father replied, "That is the [firm] soup," which included W-2 income of $12,500 (the father testified that he had not paid himself a salary since the second quarter of 2021).  When the judge asked again how he arrived at the total $47,000 figure, the father said that it was on a spreadsheet prepared by his accountant, which he did not produce at trial.

[16] The only documents that the father submitted regarding his firm's finances for 2021 was a profit and loss statement that he prepared using the "QuickBooks" software, which was not supported by any documentation apart from his 2021 W-2 from the firm.

husband's income and assets is his own doing; the production of records is a matter entirely within his control").

There is nothing in the record convincing us that the judge's assessment of the father's credibility regarding his finances was "plainly wrong" (citation omitted). Zaleski v. Zaleski, 469 Mass. 230, 237 (2014). Accordingly, based on the record before us, we discern no abuse of discretion in the attribution of income to the father and calculation of his child support obligation. See Davae, 100 Mass. App. Ct. at 57.[17]

> Judgment of divorce nisi
>   dated December 8, 2022,
>   affirmed.
>
> Judgment of contempt dated
>   September 28, 2022,
>   affirmed.
>
> Order dated April 6, 2023,
>   denying motion to stay,
>   affirmed.
>
> Single justice order dated
>   May 25, 2023, denying
>   motion to stay, affirmed.
>
> By the Court (Sacks, Singh &
>   Walsh, JJ.[18]),

---

[17] Because we are affirming the divorce judgment, the father's arguments pertaining to the denial of his motion in this court to stay the divorce judgment are moot, and we need not address them. That said, we discern no error or abuse of discretion by the single justice, as the father failed to demonstrate a likelihood of success on the merits. See C.E. v. J.E., 472 Mass. 1016, 1017 (2015).

[18] The panelists are listed in order of seniority.

Assistant Clerk

Entered:   June 11, 2024.