NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1035                                        Appeals Court


   KARINA SCHECHTER  vs.  YAN SCHECHTER (and a companion case[1]).


                         No. 13-P-1035.

      Suffolk.     September 9, 2014. - September 9, 2015.

         Present:  Rapoza, C.J., Carhart, & Agnes, JJ.[2]


Divorce and Separation, Child custody, Modification of judgment,
     Findings, Visitation, Attorney's fees.  Parent and Child,
     Custody.  Minor, Custody, Guardian ad litem, Visitation
     rights.  Abuse Prevention.  Contract, Antenuptial
     agreement.  Husband and Wife, Antenuptial agreement.
     Practice, Civil, Attorney's fees.



     Complaints for divorce and for protection from abuse filed
in the Suffolk Division of the Probate and Family Court
Department on June 8, 2009, and September 14, 2009,
respectively.

     After consolidation, the cases were heard by John M. Smoot,
J.


     Lawrence F. Army, Jr. (William S. Smith with him) for the
father.
     Alanna G. Cline for the mother.

     _____

     [1] The companion case is between the same parties.

     [2] Chief Justice Rapoza participated in the deliberation on
this case prior to his retirement.

Jerome Aaron, for National Parents Organization, Inc., amicus curiae, submitted a brief.

AGNES, J.  These are consolidated appeals by the defendant Yan Schechter (the father) from a judgment of divorce nisi and an abuse prevention order.  One child, a son who is still a minor (the child), was born of the marriage.  The judgment awarded sole legal and physical custody of the child to the plaintiff Karina Schechter (the mother).  The father's appeal presents four principal issues for our consideration.  First, we review the custody determination and the validity of a judgment provision suspending the father's visitation rights for one year, along with a corresponding G. L. c. 209A order precluding any contact between the father and child during that period.  Second, we review the judgment's removal provision (see G. L. c. 208, § 30), which provides that the mother has the right to remove the child "from the Commonwealth of Massachusetts to the state of New York or another state if the opportunity for employment and security is more readily available elsewhere."  Third, we review the judge's determination that the parties' prenuptial agreement was not "fair and reasonable" at the time of its execution and was thus not valid.  Finally, we consider the judge's award of attorney's fees to the mother.  For the reasons that follow, we affirm the judge's orders relating to custody and visitation, the invalidity of the prenuptial

agreement, and attorney's fees, but conclude that the removal provision was not in compliance with G. L. c. 208, § 30, and that the issue must be reconsidered after an evidentiary hearing.[3,4]

Background. The consolidated trial in these cases occurred over eighteen days in 2010 and 2011, and included testimony from thirty-eight witnesses, and 132 exhibits. The conscientious judge made 330 findings of fact, as well as detailed rulings of law. We first summarize the judge's findings, setting forth other facts later in connection with the specific legal issues we address.

The father is a Ukrainian immigrant whose family initially lived in Israel and then moved to Boston in 1988 when he was nearly sixteen. The father and his family have lived in Boston for the past twenty years. The mother emigrated from Uzbekistan and eventually moved to Boston in 1999 at age twenty to pursue educational opportunities. The father graduated from Brandeis University and had early success in a small business and as a computer consultant. Throughout their relationship, there were

---

[3] Pending a further interim or permanent order by the judge assigned to this case, the mother and the child may continue to live in Illinois. See note 22, infra. Notwithstanding the preservation of the status quo, we express no opinion how the matter should be resolved after the appropriate hearings.

[4] We acknowledge the receipt of an amicus curiae brief by the National Parents Organization, Inc.

numerous instances of emotional and economic abuse,[5] as well as

physical abuse and the threat of physical abuse, by the father

against the mother.

---

[5] In relationships in which there is domestic violence, the victim is often economically dependent on the perpetrator. See Note, Domestic Violence and Custody Litigation: The Need for Statutory Reform, 13 Hofstra L. Rev. 407, 426 (1985), cited in Opinion of the Justices, 427 Mass. 1201, 1209 (1998). Experts in the field of domestic violence describe economic or financial abuse as an element of the perpetrator's coercive control of the victim. See E.C. v. RCM of Washington, Inc., 92 A.3d 305, 319 (D.C. 2014); State v. Newall, 710 N.W.2d 6, 27 (Iowa 2006). "The CDC [Centers for Disease Control and Prevention] defines coercive control as a form of psychological aggression that includes 'behaviors that are intended to monitor, control, or threaten an intimate partner.' . . . [O]ne type of coercive control behavior includes economic abuse, defined as 'behaviors that control a woman's ability to acquire, use, and maintain economic resources.'" Kim, Credit Cards: Weapons for Domestic Violence, 22 Duke J. Gender L. & Policy 281, 285 (2015) (citations omitted). Economic abuse has also been defined as "[m]aking or attempting to make a person financially dependent, e.g., maintaining total control over financial resources, withholding access to money, forbidding attendance at school or employment." Johnson, Redefining Harm, Reimagining Remedies, and Reclaiming Domestic Violence Law, 42 U.C. Davis L. Rev. 1107, 1120 (2009). See Conner, Financial Freedom: Women, Money, and Domestic Abuse, 20 Wm. & Mary J. of Women & L. 339, 358 (2014).

In this case, the judge found that the father had the mother's car towed and was on the scene for the removal of the car, and then told the mother that everything belonged to him, that she would only get the clothes that she brought to the United States, and that she could take public transit until she earned enough to buy a car. At other times, he cancelled and later restored her credit cards when they fought. After one particular fight the mother went to the grocery store to find all of her credit cards cancelled, and the father did not restore them until the parties made up. At another time he also took and cut the mother's credit cards in half in front of her.

The father and the mother began dating in the summer of 2001 while they were both living in New York City. That fall, they both relocated to Boston, where the mother began her final year of college while continuing to work as a dental hygienist. The father became involved in the residential real estate business and again met with success. Initially, the couple lived with the father's parents and then moved in with friends of the father. From the inception, it was evident that the father's family did not support the relationship. In December, 2001, the parties found out that the mother was pregnant. The father proposed marriage and the mother accepted. The father's family did not respond well to the engagement, and urged him to obtain a prenuptial agreement. The mother experienced a miscarriage in early 2002. The couple agreed to conceive another child. The mother learned that she was pregnant again in May of 2002. Meanwhile, the couple found a condominium unit they both liked in Brighton and the father purchased it in the name of his real estate company.

During that same month, the mother graduated from college and started preparing for the Dental Admission Test (DAT). The couple decided it was best for the mother not to work and to focus on studying for her DAT. In spite of this agreement, the father continually criticized the mother for avoiding work and implied that she was exaggerating her morning sickness. He made

disparaging comments to her suggesting that she was worthless, and did little to assist her with household chores.

1. Marriage. On December 18, 2002, days before their marriage, the parties signed a prenuptial agreement that the father had been discussing with lawyers since December of 2001. The father had real estate assets in the greater Boston area estimated to be worth over seven million dollars. They were married on December 22, 2002.

The father's emotional abuse of the mother was constant and continued during their marriage. It is documented in the judge's findings of fact in great detail. The mother gave birth in February of 2003. During this time, the mother chose to pursue a degree as a dentist. By April of 2008, the stock market suffered a serious downturn and the father had a breakdown, becoming extremely anxious over his real estate business. He was hospitalized and constructively incapacitated.[6]

By September of 2008, the mother returned to school and the father became frustrated that the mother did not spend more of her free time with him. He did not approve of the mother's friendships with particular female friends. By the time the

---

[6] The father sought to protect assets and decided to transfer title of the marital home from his business entity into his and the mother's name, as tenants in the entirety, in order to utilize the Massachusetts homestead law.

mother prepared to graduate from dental school,[7] the father told the mother that he wanted her to stay home and care for the household. The mother started work as a dentist in the practice where she had previously been employed as a dental assistant for ten years. As a dentist she worked as an independent contractor, receiving forty percent commission.

2. <u>Separation</u>. On May 30, 2009, the father and the mother separated. Soon after the father left their home, he telephoned the mother and said that he intended to get a divorce and needed to speak with her that night after the child went to bed. She agreed to talk. The mother and child then went to visit a friend. As the mother was leaving to return home, she found that her car was being towed and saw the father emerge from the tow truck's passenger seat. He got into his own car and drove away, staring at her intently with an angry look as he passed. Afraid to go home, the mother and child spent the night at the friend's house. The father, by his own account, grew furious. He expected that the mother would get a ride home so that he could kiss the child good night and have a discussion with her about the marriage. He failed to understand the natural response to the intimidation of having one's car towed.

---

[7] The mother graduated from Tufts Dental School in May of 2009, magna cum laude.

While at the family home waiting for the mother, the father gathered up several pairs of her shoes, some boots, and a purse and put them in the oven. He turned the oven on and left. He stated that "[i]t seemed like the most harmless way to piss her off." The father's father went to the home to shut the oven off.

The parties did not live together after the father moved out of the home. The father attempted to get key access to the building adjacent to and overlooking the marital home, but his request was not granted.

3. Legal proceedings. On June 8, 2009, the mother filed a complaint for divorce. On September 14, 2009, she filed a separate complaint in which she sought protection from abuse under G. L. c. 209A. In support of the protective order issued by the court, the judge cited an instance in which the father threatened, "I'm coming with an axe to chop you up," after the mother would not agree to let the child have a sleepover.[8] On another occasion months later, when the mother picked up the child from a supervised visit with the father, the supervisor witnessed as the father pulled up behind the mother's car, "revved" his engine, swerved his car back and forth, then accelerated around her car, completely crossing the double line in the street, and raced away.

_____

[8] See note 15, infra.

During this time frame, the father transferred a significant interest in his business into his parents' names. He sought to give his parents retroactive distributions of his own personal share of profits. The father claimed his income was $580 per week, which the judge found was a "completely unreliable" estimation.

4. <u>Guardian ad litem report</u>. As part of the proceedings, a psychologist was appointed as guardian ad litem (GAL) on behalf of the child to evaluate the issues of custody and parenting time, and later the issue of removal. The GAL issued an extensive report dated April 15, 2010 (and supplemented that September), that detailed his observations and interactions with family members. The report concluded that the father dominates both the mother and the child with his words and actions. The father appeared to have agendas concerning information he wanted to discuss or disclose and rewarded the child when he cooperated. On the other hand, the GAL observed that "[the mother] allows [the child] to be himself and have his own thoughts and feelings, and to express them without fear or reservation." The GAL cited a number of parenting decisions that reflected poor judgment on the father's part. The GAL pointed out that there was extensive "mudslinging" by the father

against the mother, while the mother focused only on trying to do what is best for the child.[9]

Discussion. 1. Standard of review. The judge's factual findings must be left undisturbed absent a showing that they are plainly wrong or clearly erroneous. This deferential standard applies to our review of cases involving custody and visitation, see Felton v. Felton, 383 Mass. 232, 239-240 (1981); Rosenberg v. Merida, 428 Mass. 182, 191 (1998); Loebel v. Loebel, 77 Mass. App. Ct. 740, 747 (2010); as well as to factual findings in connection with removal under G. L. c. 208, § 30, see Mason v. Coleman, 447 Mass. 177, 186 (2006); Murray v. Super, 87 Mass. App. Ct. 146, 148 (2015). See also Mass.R.Dom.Rel.P. 52(a). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting from Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977). "In applying the standard, the judge's assessment of the weight of the evidence and the credibility of

---

[9] Unsatisfied with the GAL interviews, the father provided a recording of his own interview with the child that was "clearly staged." During a supervised dinner on March 7, 2010, the father took the child into the bathroom and told him his mother was at fault for what was going on in the family.

the witnesses is entitled to deference." Custody of Two Minors, 396 Mass. 610, 618 (1986). However, in reviewing the ultimate determination on custody and visitation, we consider whether there was an abuse of discretion in how the judge accounted for the child's best interests. See Sagar v. Sagar, 57 Mass. App. Ct. 71, 79 (2003). See also Youmans v. Ramos, 429 Mass. 774, 787 (1999). "[A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made 'a clear error of judgment in weighing' the factors relevant to the decision." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) (citation omitted).

2. Parenting issues. a. Custody and visitation. i. The terms of the judgment. The judgment ordered that the mother have sole legal and physical custody of the child and that "[t]here shall be a one year cessation of any contact between [the child] and his father." "In Massachusetts the focus in a custody dispute between parents is not on their personal rights but on the welfare of the child." Kindregan et al., Family Law and Practice § 61.1, at 307 (2013) (collecting cases). "[I]n deciding issues involving custody, the overriding concern of the court must be the promotion of the best interests of the children and their general welfare." Rolde v. Rolde, 12 Mass. App. Ct. 398, 402 (1981). See Carr v. Carr, 44 Mass. App. Ct. 924, 925 (1998). In exercising discretion, the judge is

authorized "to consider the widest range of permissible evidence." Loebel, 77 Mass. App. Ct. at 747 (citation omitted).

The father maintains that "the minimal findings here do not support any plausible contention that the best interests of the child standard was properly applied here." This is a gross mischaracterization of the basis for the judge's rulings. The judge dealt with the parties for more than two years and had numerous opportunities to observe their interactions, as well as to assess witness accounts of how they treated each other and interacted with their child. The judge also had the benefit of the comprehensive and detailed GAL report, which is part of the record on appeal. The judge documented numerous instances of the father's abusive and degrading conduct toward the mother before and during the marriage, including several instances in which the father threatened to kill or do great bodily harm to the mother. In making a decision about legal or physical custody, a judge "shall consider whether or not the child's present or past living conditions adversely affect his physical, mental, moral or emotional health." G. L. c. 208, § 31, as appearing in St. 1989, c. 689. Furthermore, in such cases the judge "shall consider evidence of past or present abuse toward a parent or child as a factor contrary to the best interest of the child." G. L. c. 208, § 31A, inserted by St. 1998, c. 179,

§ 3.[10]  Where there is a finding of "a pattern or serious incident of abuse," the judge must employ a rebuttable presumption that sole or shared custody with the abusive parent is not in the child's best interests.  <u>Ibid</u>.[11]  Here, the

_____

[10] General Laws c. 208, § 31A, defines "abuse" as follows:

"the occurrence of one or more of the following acts between a parent and the other parent or between a parent and child:  (a) attempting to cause or causing bodily injury; or (b) placing another in reasonable fear of imminent bodily injury."

[11] The statute specifies,

"[a] probate and family court's finding, by a preponderance of the evidence, that a pattern or serious incident of abuse has occurred shall create a rebuttable presumption that it is not in the best interests of the child to be placed in sole custody, shared legal custody or shared physical custody with the abusive parent.  Such presumption may be rebutted by a preponderance of the evidence that such custody award is in the best interests of the child."

G. L. c. 208, § 31A.  (We note that this same rebuttable presumption governs temporary custody determinations in abuse prevention proceedings in the Probate and Family Court.  G. L. c. 209A, § 3[<u>d</u>].)

The section defines "serious incident of abuse" as

"the occurrence of one or more of the following acts between a parent and the other parent or between a parent and child:  (a) attempting to cause or causing serious bodily injury; (b) placing another in reasonable fear of imminent serious bodily injury; or (c) causing another to engage involuntarily in sexual relations by force, threat or duress."

G. L. c. 208, § 31A.

Finally, the statute directs,

rebuttable presumption applied. The G. L. c. 209A order that issued as to the mother, discussed in more detail infra, rested on a finding that the father placed the mother in fear of imminent serious physical harm. See G. L. c. 209A, § 1 (part [b] of definition of "abuse"). (The father does not challenge this aspect of the c. 209A order.) In the circumstances, this amounted to a finding of a "serious incident of abuse" under G. L. c. 208, § 31A (part [b] of definition), which triggered the presumption.

We recognize that "parents have a fundamental interest in their relationships with their children that is constitutionally protected." Opinion of the Justices, 427 Mass. 1201, 1203 (1998). However, the strong expression of public policy by our Legislature that a child's welfare must be the paramount concern when a judge determines custody, see G. L. c. 208, §§ 31 and 31A, and G. L. c. 209A, § 3(d), means that a judge is authorized not only to order sole legal and physical custody with one parent when it serves the best interests of the child, see,

---

> "[i]f the court finds that a pattern or serious incident of abuse has occurred and issues a temporary or permanent custody order, the court shall within 90 days enter written findings of fact as to the effects of the abuse on the child, which findings demonstrate that such order is in the furtherance of the child's best interests and provides for the safety and well-being of the child."

Ibid. (Again we note the identical requirement appears in G. L. c. 209A, § 3[d].)

e.g., Carr, 44 Mass. App. Ct. at 925; Custody of Zia, 50 Mass. App. Ct. 237, 241-245 (2000), but also that a judge is authorized to impose conditions and restrictions on and to suspend any visitation by the other parent when it is determined that visitation would not be in the best interests of the child. See, e.g., Donnelly v. Donnelly, 4 Mass. App. Ct. 162, 163-164 (1976). In cases such as this, our duty as a reviewing court is to ensure that the record reflects that all relevant factors have been considered by the judge, and that the decision is based on a fair weighing of the factors. See L.L., 470 Mass. at 185 n.27.

In this case, the judge made findings that the father was domineering in his relations with the mother and child. The judge credited the GAL's observation that the father repeatedly made negative comments and disparaging references to the mother in the child's presence, "and spent considerable time and impassioned energy impugning [the mother's] moral character." The judge also documented the father's lack of insight into the destructive nature of his behaviors, his tendency to blame others for everything, and his lack of impulse control. As the judge correctly noted, "[a] determination of whether a parent is able to separate his or her needs and interests from those of the minor children and whether a parent's actions will compromise the minor children's relationship with the other

parent are relevant factors in determining custody."  See

Hernandez v. Branciforte, 55 Mass. App. Ct. 212, 220-221 (2002).

Finally, the judge explained why neither unsupervised nor

supervised visitation between the father and the child was

feasible.[12]

The judge's decision to suspend visitation for one year is

also supported by his extensive findings that over the course of

their relationship, the father had engaged in physical,

emotional, and financial abuse of the mother, and, in his

interactions with the child, had damaged the mother's

relationship with the child.[13]  See G. L. c. 208, § 31A.

---

[12] The judge added that

"[a]llowing unsupervised contact between [the father] and
[the child] would be a capitulation to a manipulative
parental alienator.  Continuing to allow supervised contact
between [the father] and [the child] is a recipe for
continued misery.  No list of rules prohibiting certain
behaviors could ever encompass all the ways [the father]
will find to harass, intimidate, berate, and manipulate all
those involved.  The hard reality is that it is in [the
child's] best interest to place a moratorium on any
communication or contact between him and his father."

[13] The judge found that

"a.  The findings entered in this case clearly demonstrate
that the father's behavior is not transitorily connected to
the divorce action; it is symptomatic of a more permanent
condition.  Many of the behaviors described predate any
contemplation of divorce by the parties.  They also predate
the financial crisis of 2008 when the father was under
great stress.

Children who experience domestic violence, whether as direct witnesses or indirectly as members of the household in which violence occurs, "suffer deep and profound harms," Opinion of the Justices, 427 Mass. at 1203;[14] here, the evidence in the record does not rebut the judge's factual determinations

---

"b.   The father cannot have unsupervised visits because he will cause [the child] serious emotional harm and destroy [the child's] relationship with the mother.

"c.   The father cannot have supervised visits without constantly instigating a crisis that drains the energy of all involved.

"d.   [The child] needs for his mother to have the opportunity to safely rebuild her strength and that outweighs, for the near future, the child's need to continue the relationship with his father wherein the father uses manipulation to twist [the child's] thoughts and confuse him.  If the mother is not safe, secure, and protected, [the child] will have two dysfunctional parents."

The judge also credited the GAL's observation that during interviews, in discussing the father's parenting and behavior problems, the mother "generally spoke about her wish for [the father] to correct those problems so he could be a better parent.  There was never the sense of the character-assassination that pervaded [the father's] interactions."  The judge found the mother, on the other hand, has "demonstrated appropriate parenting skills, supporting [the child] without smothering him.  She makes a distinction between one's behavior and the essence of one's being.  She is committed to [the child], consistent in her parenting, and she provides [the child] with stability.  She has a loving relationship with [the child]."

[14] "Very disruptive symptoms related to trauma can be exhibited by children even when they have not been personally subjected to direct physical or sexual abuse."  Guidelines for Judicial Practice:  Abuse Prevention Proceedings § 12.02, Commentary (Admin. Office of Trial Ct. 2011).

illustrating the point.  The findings are amply supported by the evidence and demonstrate that the decision to suspend the father's visitation rights with the child was based on the exercise of a sound discretion.

ii.  The G. L. c. 209A order.  The original abuse prevention order was an emergency order issued ex parte on September 13, 2009, as a result of an episode over whether the father could have an overnight visitation with their child at the home of the child's friend.  (There was an order in effect at the time that required written consent by both parties for the father to have an overnight visit.)  Several days later, the court conducted an extension hearing at which it heard from the mother and the father as well as their attorneys.  The judge credited the mother's account of the events, which involved threatening behavior and impulsive misconduct directed toward her by the father in the presence of the child.[15]  The judge

---

[15] The judge found that the father sought the mother's consent for the overnight via a telephonic text message.  After consulting with the parenting coordinator, the mother telephoned the child's friend's home and asked to speak to the child.  The father took the telephone from the child and told the mother the child wanted to sleep over and then hung up.  The judge found that "[the father] then called back screaming in a rage.  Seeing [the mother] shaking and hearing [the father's] voice yelling, [a family friend who was with the mother] took the phone himself in time to hear [the father] threaten to kill [the mother] with an ax[e].  [The family friend] heard [the father] say in Russian, 'I'm coming with an axe to chop you up.'"  The judge also found that although the child is not fluent in Russian, he heard and understood enough of the conversation to be "aware

extended the abuse prevention order for one year, and later extended it again on several occasions prior to the consolidated trial.

The order was made a permanent abuse prevention order on February 3, 2012, the same day the divorce judgment entered. The judge's endorsement reads as follows: "This order is entered after an 18 day trial on cross complaints for divorce and on plaintiff's complaint for protection from abuse. Although the order is permanent, paragraph 7 may be reviewed after one year." In paragraph 7, the father is ordered not to contact the child and not to come within fifty yards of him.

The father does not challenge the substance of the c. 209A order insofar as it bars him from abusing or contacting the mother. The father's principal contention is that he was deprived of notice and the right to be heard before the issuance of the permanent abuse prevention order. However, this claim is not supported by the record.[16]

---

that his father was very mad and intended to 'kick his mother's butt.'"

[16] At the original extension hearing on September 15, 2009, the judge invited counsel to develop a joint recommendation for the father to have supervised visitation. An agreement could not be reached. Instead the judge extended the G. L. c. 209A order for one year, which included barring contact between the father and the child. However, the judge left the door open to a modification of the order, to permit visitation between the father and the child. The judge inquired, "Do the parties want to work out visitation or bring a motion for visitation? I'll

The father appears also to challenge the judge's decision to incorporate the one-year suspension of visitation into the permanent abuse prevention order under c. 209A. The argument is that, in order to include a no contact with a child provision in an abuse prevention order (i.e., paragraph 7), there must be evidence of and a judicial finding that the child was suffering from "abuse" as that term is defined in G. L. c. 209A, § 1.[17] It is true that the statute requires a person seeking an abuse prevention order, such as the mother in this case, to demonstrate that she was suffering from "abuse," as defined in G. L. c. 209A, § 1, in order to obtain any relief under G. L.

_____

deal with it in an appropriate fashion. But as far as the emergency goes, it's extended for a year." Clearly, by this stage of the case the father was on notice that whether he would be permitted to have contact with the child was a live issue that the judge would resolve in his final decision after the consolidated trial. Following this hearing, as the mother points out in her brief, the court addressed the abuse prevention order eight times prior to the entry of the permanent order on February 3, 2012. During the consolidated trial, the father testified and cross-examined a number of witnesses, including the mother, on matters relating to the order.

[17] General Laws c. 209A, § 1, as appearing in St. 1990, c. 403, § 2, defines the term "abuse" as "the occurrence of one or more of the following acts between family or household members: (a) attempting to cause or causing physical harm; (b) placing another in fear of imminent serious physical harm; (c) causing another to engage involuntarily in sexual relations by force, threat or duress." There is only one finding by the judge here that addresses the father's use of force against the child. The judge found that on one occasion the father slapped the child on the back of his neck for misbehaving while in custody of the babysitter. Without more, we cannot say that this was an act of abuse within the meaning of G. L. c. 209A, § 1.

c. 209A, § 3(a)-(c) (no abuse, no contact, leave and remain away from plaintiff's household and workplace). "Abuse" under G. L. c. 209A, § 1, requires a judicial determination that the plaintiff is in danger of imminent and serious physical or sexual harm. See Commonwealth v. Jacobsen, 419 Mass. 269, 273-274 (1995); Smith v. Jones, 67 Mass. App. Ct. 129, 132-133 (2006).

However, in such a case a judge is not also required to find that the defendant has committed a separate act or acts of abuse against the parties' child to order that the defendant have no contact with that child. Under the statute, "A person suffering from abuse from an adult or minor family or household member may file a complaint in the court requesting protection from such abuse, including . . . (h) ordering the defendant to refrain from abusing or contacting the plaintiff's child, or child in plaintiff's care or custody, unless authorized by the court . . ." (emphasis supplied). G. L. c. 209A, § 3, as appearing in St. 1990, c. 403, § 3. As the statute also expressly provides, "a finding by [the Probate and Family Court] by a preponderance of the evidence that a pattern or serious incident of abuse, as defined in [G. L. c. 208, § 31A,[18]] toward a parent or child has occurred shall create a rebuttable

_____

[18] See notes 10 & 11, supra, for the definitions of "abuse" and "serious incident of abuse" under G. L. c. 208, § 31A.

presumption that it is not in the best interests of the child to be placed in sole custody, shared legal custody or shared physical custody with the abusive parent" (emphasis supplied).[19] G. L. c. 209A, § 3(d), as amended by St. 1998, c. 179, § 5. Additionally, in abuse prevention proceedings, "[i]f ordering visitation to the abusive parent, the court shall provide for the safety and well-being of the child and the safety of the abused parent." Ibid. That an act of serious abuse or a pattern of abuse committed by one parent against another parent may support the issuance of a c. 209A order on behalf of the abused parent as well as an order prohibiting the abuser from having contact with the child is based on the interrelationship between the provisions of c. 208 and c. 209A, noted above, and reflects the critical understanding, also noted previously, that children who experience domestic violence "suffer deep and profound harms." Opinion of the Justices, 427 Mass. at 1203. See note 14, supra.

Our decision in Szymkowski v. Szymkowski, 57 Mass. App. Ct. 284, 288 (2003), is not to the contrary. There, we concluded that an abuse prevention order obtained by the defendant's

_____

[19] See Guidelines for Judicial Practice:  Abuse Prevention Proceedings § 12.03 (Admin. Office of the Trial Ct. 2011) ("The Court shall provide for the safety and well-being of the child and the safety of the abused parent when custody is awarded to the perpetrator of the violence").

former wife on behalf of the defendant's minor daughter was invalid because the plaintiff mother had not demonstrated that the child was the victim of "abuse" as defined in G. L. c. 209A, § 1.[20]  In the present case, on the other hand, the judge's well documented findings of fact showed that there was at least one "serious incident of abuse" by the father against the mother -- i.e., placing her in reasonable fear of imminent serious bodily injury -- see note 15, supra; that the child witnessed the father's abusive behavior toward the mother; and that any contact between the father and the child within a period of at least one year would damage the mother's relationship with the child and be harmful to the child.  These findings not only justified the provisions of the c. 209A order directly ensuring the safety of the mother, but also supplied the basis for the provisions of the final order regarding child custody, contact,

---

[20] It is significant that Szymkowski was a case where the mother sought the order only on behalf of the child, and alleged abuse only against the child.  The mother did not seek the order for her own protection.

When a parent who has custody of a child satisfies the requirements for an abuse prevention order for the parent's own protection, before any order is made on behalf of the other parent relating to visitation with that child, the judge should assess the safety of the family.  In these most sensitive cases, judges should make every effort to craft any order relating to visitation so as "to protect the emotional and physical well being of the child and the non-abusing parent, while preserving both parent-child relationships."  Guidelines for Judicial Practice:  Abuse Prevention Proceedings § 12:01, Commentary (Admin. Office of the Trial Ct. 2011).

and visitation.  The judge also did not err in failing to conclude that the father rebutted the presumption against his custody resulting from the serious incident of abuse, or that the evidence established that there was a feasible alternative to the suspension of visitation.

This case also is distinguishable from Smith v. Joyce, 421 Mass. 520, 522-523 (1995), in which a judge of the Probate and Family Court extended a c. 209A order directing the defendant father to stay away from the plaintiff mother and their two sons, exclusively on the basis of evidence that the father had placed the mother in fear of imminent serious physical harm.  In vacating the order as to the sons, the court noted that "[t]he judge should have considered the defendant's relations with his sons apart from the plaintiff's request that the defendant stay away from her.  If there is to be a G. L. c. 209A order that a defendant stay away from and have no contact with his or her minor children, there must be independent support for the order."  Id. at 523.  Here, however, the judge's findings reflect that he focused attention on the relationship between the father and the child.  Furthermore, in this case, unlike in Smith, there is "independent" evidence apart from the father's abuse of the mother in that the child witnessed at least one serious act of domestic violence.  Moreover, the judge explained that, due to the father's chronic misbehavior, any contact

during at least a period of one year between the father and the child will cause the child to suffer serious emotional harm. For these reasons, the judge did not err in including a one-year suspension of visitation in the permanent abuse prevention order under G. L. c. 209A.

b. The removal order. The judgment provision in question is as follows: "The mother is granted the right to remove [the child] from the Commonwealth of Massachusetts to the State of New York or another state if the opportunity for employment and security is more readily available elsewhere. . . . The mother shall keep her attorney informed of any changes in her address." On several occasions during these proceedings, the mother sought permission to move with the child to New York.

A request for removal is governed by G. L. c. 208, § 30, which states that "[a] minor child of divorced parents who is a native of or has resided five years within this commonwealth and over whose custody and maintenance a probate court has jurisdiction shall not, if of suitable age to signify his consent, be removed out of this Commonwealth without such consent, or, if under that age, without the consent of both parents, unless the court upon cause shown otherwise orders." G. L. c. 208, § 30, as amended by St. 1986, c. 462, § 9. The statutory standard of "upon cause shown" means that removal must be in the best interests of the child. Yannas v. Frondistou-

Yannas, 395 Mass. 704, 711 (1985). In Yannas, the court held that the judge must determine whether the proposed move represents a "real advantage" to the custodial parent. Id. at 710. Yannas interpreted G. L. c. 208, § 30, to require the judge to conduct a two-stage analysis to determine whether to permit a custodial parent to move with the child or children to another jurisdiction. In the first stage, the custodial parent must demonstrate, and the judge must find, that the custodial parent has set forth a "good, sincere reason for wanting to remove to another jurisdiction," id. at 711, and that the custodial parent is not motivated by a desire to deprive the noncustodial parent of reasonable visitation. Ibid. See Murray, 87 Mass. App. Ct. at 149-150. If the judge makes these threshold determinations, the judge then moves to the second stage of the analysis. In the second stage, the question is whether on balance, taking into consideration the interests of the custodial and noncustodial parents, and the impact of such a move on the child, removal is in the best interests of the child. Yannas, 395 Mass. at 711-712. No single factor is "controlling in deciding the best interests of the child, but rather they must be considered collectively." Id. at 712.

We recently explained that the real advantage test does not mean that so long as the custodial parent is advantaged by a move to another State, a judge is required to approve the

request.  Murray, 87 Mass. App. Ct. at 153.  Ultimately, the judge must determine that removal is in the best interests of the child.  Id. at 150.  See Dickenson v. Cogswell, 66 Mass. App. Ct. 442, 447 (2006).

In the present case, the judge did make findings of fact that are relevant to a proper determination whether removal would be a real advantage to the mother.  These include many of the findings that are enumerated above in connection with our consideration of the issues of custody and visitation.  The judge made additional findings relating to the mother's interest in establishing a dental practice.  However, the order entered by the judge does not satisfy the requirements of § 30.  The statute requires a judicial determination that removal will be a real advantage and ultimately in the child's best interests.[21] And that judicial determination of real advantage must be with reference to a specific location in another State.  The order in this case impermissibly leaves the decision whether to remove and to where to remove solely in the hands of the mother.  Under the terms of the order, the mother could choose to remain in Massachusetts for an indefinite period of time and then, without notice to the court or the father, relocate to another

_____

[21] When the stage one analysis is a close question, it is helpful for the judge to conduct the stage two analysis involving the "collective balancing of interests."  Dickenson, 66 Mass. App. Ct. at 448-449.

jurisdiction of her choosing, or continue to move from one location to another as she sees fit. The judge failed to determine that there is a real advantage to the custodial parent to relocate her home to another specific State outside of Massachusetts (stage one of the analysis), and that on balance, considering all of the relevant factors, this would be in the child's best interests (stage two of the analysis). See Murray, 87 Mass. App. Ct. at 150 (at the second stage of the analysis, "[t]he relevant factors are: [1] whether the quality of the children's lives will be improved, including any improvement that 'may flow from an improvement in the quality of the custodial parent's life'; [2] any possible 'adverse effect of the elimination or curtailment of the child[ren]'s association with the noncustodial parent'; [3] 'the extent to which moving or not moving will affect the [children's] emotional, physical, or developmental needs'; [4] the interests of both parents; and [5] the possibility of an alternative visitation schedule for the noncustodial parent" [citation omitted]). See also Dickenson, supra at 449-452.

Despite the judge's decision documenting the father's abuse of the mother and concluding that the father's visitation with the child should be suspended, the judge did not terminate the father's parental rights, and clearly left open the possibility of a modification of his order precluding visitation. In a case

such as this, the father's constitutional rights as a parent require that the judge considering a request for removal take into account the potential for the father to seek a resumption of visitation. See <u>Blixt</u> v. <u>Blixt</u>, 437 Mass. 649, 653 (2002), cert. denied, 537 U.S. 1189 (2003), quoting from <u>Troxel</u> v. <u>Granville</u>, 530 U.S. 57, 66 (2000) ("[T]he Due Process Clause of the Fourteenth Amendment [to the United States Constitution] protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children").

In light of the fact that more than three years have passed since the judgment was entered and the mother and the child relocated to Illinois, we conclude that a further evidentiary hearing is required to enable a judge to make a decision whether the mother's request for removal to a specific State is warranted on the basis of a contemporaneous record. In determining the best interests of the child, weight, of course, should be given to the fact that "[s]tability is itself of enormous benefit to a child, and any unnecessary tampering with the status quo simply increases the risk of harm to the child." <u>Custody of Kali</u>, 439 Mass. 834, 843 (2003).[22]

---

[22] Although we vacate the judge's permanent removal order, pending a further interim or permanent order the mother and the child may continue to reside in Illinois. The trial judge in this case has retired and thus the matter will have to be assigned to another judge. Notwithstanding the preservation of the status quo, we express no opinion of the merits of any

3. <u>The prenuptial agreement</u>. The judge ruled that the prenuptial agreement signed by the mother on December 18, 2002, just days before her marriage and while she was seven months pregnant, was unfair and unreasonable at the time it was executed, and thus was void. See <u>DeMatteo</u> v. <u>DeMatteo</u>, 436 Mass. 18, 31-33 (2002). The judge found that the father's parents did not trust the mother, did not want her to share in the ownership of the father's assets, and were the driving force behind the agreement. Although each party was represented by counsel, the evidence supports the judge's finding that the negotiation was brief and one-sided. The mother first met with her attorney on October 31, 2002. In mid-November, the mother's attorney sent a series of draft proposals to be included in the agreement to the father's attorney. The father rejected the proposed terms and on December 16, 2002, the father's attorney sent the father's terms by electronic mail to the mother's attorney with a message that due to the wedding scheduled for the following week the father "would like to sign this tomorrow as relatives are arriving on Wednesday and . . . schedules will be quite hectic after that." Although the mother's lawyer informed the father's lawyer that the father "ha[d] to put something on the table" in light of the enormous disparity in

_____

future decision that may be made with regard to removal, custody, or visitation.

the assets of the parties, the father did not alter his position.  The mother agreed to the terms of the proposed agreement.

The terms of the prenuptial agreement are not in dispute. As summarized by the judge, it provides in substance as follows:

> "a.  The parties desire to fix the rights and claims of each that would accrue by reason of marriage in the event the marriage is terminated by death or divorce.
>
> "b.  The parties would not marry without such an agreement being in place.
>
> "c.  The parties are aware of the relevant law and of the rights to which they might become entitled after marriage with regard to estate of the other, alimony and distribution of property upon a divorce.
>
> "d.  All assets acquired before the marriage shall belong to the person who acquired them.
>
> "e.  Any assets, except the marital home, acquired after the marriage in the name of one person shall be presumed to be the sole property of that person.
>
> "f.  With regard to the marital home, [the father] is credited with full equity at the date of marriage and the parties share equally in any net increase in value thereafter.
>
> "g.  Assets acquired by joint means or by a mix of each party's separate means shall be deemed joint property.
>
> "h.  In the event of divorce, the net value of jointly owned assets shall be divided equally between the parties.
>
> "i.  Liabilities incurred by either party individually remain the obligation of that party; liabilities incurred jointly are joint obligations.
>
> "j.  Alimony in the form of a lump sum payment capped at $5,000/year times the number of full years of marriage."

The father maintains that the judge disregarded DeMatteo, supra, by concluding that the prenuptial agreement was void ab initio simply or principally because there was a significant disparity in the net worth of the parties. See Bruno, Insuring the Knot: The Massachusetts Approach to Postnuptial Agreements, 45 Suffolk U.L. Rev. 397, 410 (2012) ("[A]n [antenuptial] agreement need not and should not be considered unfair and unreasonable simply because it is one-sided"). In DeMatteo, the parties' disclosures indicated that the wife's assets were approximately $5,000 while the husband's assets were between 108 and 133 million dollars. 436 Mass. at 21 n.4. The Supreme Judicial Court concluded that the judge erred in determining that the prenuptial agreement was void from the outset, even though it provided that upon divorce the husband would retain most of the assets he acquired prior to the marriage.[23] Id. at 34. In reaching this result, the court was guided by the rules that require an examination of whether "(1) [the agreement] contains a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement; (2) the

---

[23] The agreement provided that upon termination of the marriage by divorce, "the wife would receive the marital home free of encumbrance, yearly support of $35,000 until her death or remarriage with an annual cost-of-living increase, an automobile, and medical insurance until her death or remarriage. All property jointly acquired during the marriage would be divided between the parties in equal shares." DeMatteo, 436 Mass. at 22 (footnotes omitted).

contesting party was fully informed of the other party's worth prior to the agreement's execution, or had, or should have had, independent knowledge of the other party's worth; and (3) a waiver by the contesting party is set forth." Id. at 26, quoting from Rosenberg v. Lipnick, 377 Mass. 666, 672 (1979).

In DeMatteo, the court noted that the judge found that the wife was "fully informed" of her husband's net worth before the agreement was signed, and that she had the advice of independent counsel. 436 Mass. at 27. Although the judge described the negotiations that led to the agreement as minimal, the court found this fact insufficient to invalidate the agreement. "The parties reached agreement after full disclosure of their respective financial positions and after negotiations during which they exchanged offers and counteroffers." Id. at 28.

In the present case, unlike in DeMatteo, the judge found a lack of full disclosure. For example, the father claimed during the divorce proceedings and represented to the mother during their marriage that his primary asset, his real estate company Millennium R.E. LLC (Millennium), is a partnership in which his parents own a one-half interest. The father attempted to make a fifty-percent, retroactive distribution of Millennium's assets to his parents during the divorce proceedings.[24] See Rostanzo v.

---

[24] The judge noted that financial transactions involving Millennium were exceedingly complex and not fully disclosed.

Rostanzo, 73 Mass. App. Ct. 588, 598 (2009) ("'Full and fair' financial disclosures are a 'significant aspect' of fair dealings between parties entering into an antenuptial agreement and an essential prerequisite for a meaningful waiver of marital rights") (citation omitted).

The judge also identified other reasons why the prenuptial agreement was unfair and unreasonable at the time of its adoption. In particular, the judge reasoned that

> "[the father] had over $7.5 [m]illion in equity when the agreement was signed and [the mother] had $2[,]500.00 in equity. The provision for [the mother] to receive, upon a divorce, a lump s[um] payment of alimony at the rate [of] $5,000.00 for each full year of marriage is well below fair. When her lawyer tried to negotiate it up a little, [the father] said no. He negotiated himself out of a fair agreement. The property division agreement is also unfair when viewed from the date of signing. The agreement gives the wife one-half of the increase in the equity, if any, in the marital home from the date of the agreement less mortgages and encumbrances. If the parties lived in a rental home or an apartment the wife would receive no assets. If the equity in the home did not go up, the wife would receive no assets. If the husband chose to encumber the home to the maximum extent possible, the wife would receive no assets."

---

The judge found that there was substantial evidence that although his parents advanced monies to the father to enable him to purchase real estate in the beginning, they did not own half of Millennium, and that the father treated Millennium's assets as if they were his own. The judge also noted numerous real estate and bank transactions by the father both prior to and subsequent to the prenuptial agreement that establish that the father made inconsistent statements about who owned Millennium and the true nature of his actual income.

The combination of the father's failure to make a complete disclosure of his assets and income, the circumstances surrounding the negotiation and execution of the agreement,[25] and the meager provision for alimony, satisfies the requirement in DeMatteo that an agreement is unfair and unreasonable and thus invalid ab initio when "the contesting party is essentially stripped of substantially all marital interests." 436 Mass. at 31.

4. Attorney's fees. The defendant disputes the judgment provision awarding $165,000 in attorney's fees to the mother. In a divorce proceeding, the judge has discretion in awarding attorney's fees in appropriate circumstances. Cooper v. Cooper, 62 Mass. App. Ct. 130, 141 (2004), citing G. L. c. 208, § 38. If an award is within the range of reasonableness based on "an objective evaluation of the services performed" it will be affirmed on appeal. Ibid., quoting from Ross v. Ross, 385 Mass. 30, 38-39 (1982). The factors relevant to an exercise of judicial discretion in determining an award of attorney's fees in a case such as this include "the ability of the wife's

_____

[25] In Ansin v. Craven-Ansin, 457 Mass. 283, 297 (2010), the court explained that, in determining whether a prenuptial agreement is fair and reasonable when executed, a judge may consider "other factors" including "the length of the marriage, the motives of the contracting spouses, their respective bargaining positions, the circumstances giving rise to the marital agreement, the degree of the pressure, if any, experienced by the contesting spouse, and other circumstances the judge finds relevant."

counsel, the work performed, the results secured, the time spent, the hourly rates, the existence of contemporaneous time records, the financial positions of the parties, and the husband's obstructionist conduct which prolonged the proceedings . . . ." Ibid., quoting from Downey v. Downey, 55 Mass. App. Ct. 812, 819 (2002). Here, the judge was intimately familiar with the parties, the father's superior financial position, the nature of the case, and the submissions of the parties. The judge made specific findings that the father needlessly complicated the mother's efforts to discover the facts and severely and unnecessarily increased the amount of work performed by the mother's attorney. See Hunter v. Rose, 463 Mass. 488, 502 (2012). At no time throughout the course of the proceedings below did the father request a hearing on the matter of attorney's fees. On the record before us, we conclude the judge properly exercised his discretion.

Conclusion. For the reasons set forth above, the judge's detailed findings of fact support his award of physical and legal custody to the mother and his conclusion that a suspension of visitation between the father and the child for a period of one year was in the best interests of the child. As the judge did not deprive the father of any procedural rights in the conduct of the G. L. c. 209A case and did not err in including the one-year suspension of child visitation in the abuse

prevention order, the order is affirmed.  The judge was correct in ruling that the prenuptial agreement was invalid at the time of execution.  We also uphold the provision with regard to the payment of attorney's fees.  The divorce judgment is therefore affirmed except for the removal provision, which is vacated as it does not comply with the requirements of G. L. c. 208, § 30. The case is remanded for further proceedings consistent with this opinion, including, but not limited to, an evidentiary hearing on the mother's request for removal.  As noted earlier, see note 22, <u>supra</u>, pending a further interim or permanent order by the judge assigned to this case, the mother and the child may continue to live in Illinois.[26]

<u>So ordered</u>.

---

[26] We deny the mother's request for appellate attorney's fees.