NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-56

ADOPTION OF SEVY.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree issued by a judge of the Juvenile Court finding the father unfit and terminating his parental rights to his son, Sevy.[2]  We affirm.

Background.  In January 2022, Sevy was born substance exposed.  The Department of Children and Families (the department) filed a petition for care and protection and removed Sevy from his parents' custody when he was four days old and still in the hospital.  At a court hearing three days after Sevy's removal, the parents waived their right to temporary custody.  Trial on the department's petition was held in June 2023.  The judge heard from two witnesses and considered fifty-

---

[1] A pseudonym.

[2] The judge also terminated the parental rights of Sevy's mother.  The mother did not appeal.

two exhibits.  The father failed to appear for trial and the judge drew an adverse inference against him for his absence.  The judge subsequently issued detailed findings supporting her conclusion that the department had met its burden of demonstrating that the father was unfit to parent Sevy and was likely to remain so.  See Adoption of Nancy, 443 Mass. 512, 514-515 (2005).

Discussion.  1.  The father's fitness.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  Adoption of Oren, 96 Mass. App. Ct. 842, 844 (2020).  "[T]he 'parental fitness' test and the 'best interests of the child test' are not mutually exclusive, but rather 'reflect different degrees of emphasis on the same factors.'"  Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Care & Protection of Three Minors, 392 Mass. 704, 714 (1984).  "The judge must also find that the current parental unfitness is not a temporary condition" (quotation and citation omitted).  Adoption of Arianne, 104 Mass. App. Ct. 716, 720 (2024).  "We give substantial deference to the judge's decision to terminate parental rights and reverse only where the

2

findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion" (quotation and citation omitted).  Id.  "An abuse of discretion exists where the decision amounts to a clear error of judgment [in weighing the relevant factors, such] that [the decision] falls outside the range of reasonable alternatives" (quotation and citation omitted).  Id.

The parent's fitness is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Mary, 414 Mass. 705, 711 (1993).  "The inquiry is whether the parent's deficiencies place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child" (quotation and citation omitted).  Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011).

a.  Domestic abuse.  The father and the mother began their relationship in 2018, were separated from the fall of 2019 until January 2021, and were together at the time of trial.  They frequently engaged in "verbal altercations" during their relationship.  In November 2019, after the couple had separated, the mother told police that the father responded to her request that he stop contacting her by repeatedly calling her and threatening to "ruin her Thanksgiving" by making a false report

3

to police of her drug abuse. The father considered the mother "weak" and "obedient." He controlled her cell phone and email communications. The father also made videos of them having sex, which included degrading and humiliating acts the father instructed the mother to perform. The father told the mother she had to submit to the videotaping because she was his girlfriend. According to the mother, the father used threats of disseminating the videos to control her. He did disseminate some of the videos when the mother did something he viewed as "wrong." While the mother was in labor with Sevy, the father "flip[ed] out" and was removed from the hospital by security. When the mother did not tell him immediately about Sevy's birth, the father became "filled with anger [and] rage." He told the mother she was going to be "homeless" when she returned from the hospital.

The father also had a history of aggression toward other family members. In March 2022, the father's sister obtained a restraining order against him after he pushed her down a flight of stairs. In August 2022, his mother also obtained a restraining order against the father after he destroyed her property.

We reject the father's contention that his relationship with the mother represented a "lifestyle choice" in which the mother accepted a "submissive role." Beyond his verbal abuse of

4

the mother, the father's behavior constituted the type of "coercive control" that has long been recognized as a hallmark of domestic abuse.[3] See Schechter v. Schechter, 88 Mass. App. Ct. 241 n.5 (2015); K.A. v. T.R., 86 Mass. App. Ct. 554, 559 n. 9 (2014). We thus see no error in the judge's conclusion that the father's history of domestic abuse and controlling behavior with the mother, violence toward other close family members, and lack of insight into his responsibility for that behavior placed Sevy at risk. See Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005) ("Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the children").

b. Mental health and substance use disorders. The father suffered from long term mental health and substance use disorders. He reported being diagnosed with bipolar and obsessive-compulsive disorders. Despite the department's intervention and continual urgings, the father declined to participate in psychological evaluations. He adamantly refused to take prescribed mental health medications. The father acknowledged that he used drugs and reported smoking "over two million dollars" worth of crack cocaine since he started using

---

[3] Our Legislature recently codified this form of domestic abuse. See G. L. c. 209A, § 1 (d), as amended by St. 2024, c. 118, § 4.

5

it in 2000.  He used crack cocaine every weekend, including when the mother's other children were present in the home.[4]  The father also overdosed on two occasions on intravenous opioids, once four years before Sevy was born and once after removal proceedings for Sevy had begun.  Nevertheless, the father refused to undergo evaluation for substance use treatment and failed to provide the department with required drug screens.[5]  On this evidence, we discern no error in the judge's determination that there was a nexus between the father's mental health and substance use issues and his inability to parent.  See Adoption of Luc, 484 Mass. 139, 144 (2020) ("[T]he [parent]'s unwillingness to adhere to [the department's] service plan, which required [the parent] to obtain treatment for [the parent's] mental health challenges and substance use disorder, is relevant to the determination of unfitness" [quotation and citation omitted]).

c.  The father's interaction with the department. Beginning in October 2021, department social workers visited the parents' home to help them prepare for Sevy's birth.  When the department expressed concerns about the parents' lack of

_____

[4] The mother had two children from another relationship.

[5] The judge was not required to credit the father's self-reported, unverified attendance at a drug treatment program one month before trial, and apparently did not do so.

6

preparedness, the father became "escalated" and stated that he did not need the department's assistance. The father's first visit with Sevy occurred in the department's office when Sevy was six days old. When a department social worker asked the father to wear a mask to protect Sevy from potential Covid-19 exposure, he refused and "started yelling and throwing up his arms" while holding Sevy. During ensuing visits, the father was unable to bottle feed Sevy, could not remove him from his car seat without assistance, teased him, left him unattended on a couch, was unable to change his diaper, and made inappropriate statements about Sevy. The department provided the father with a parenting aide, but he became upset when the aide offered suggestions and he refused to meet with her thereafter.

During a meeting in April 2022, the father was "frequently agitated and yelling about the department." He repeatedly directed racial slurs toward a department social worker, and at one point threatened to kill her. As a result, the father's visits with Sevy were suspended until a safety plan was implemented. Once visitation was reinstated, the father canceled visits with Sevy nearly every other week and sometimes three weeks in a row. Beginning in October 2022, visits were changed to once a month due to the father's frequent cancellations.

During monthly visits with Sevy in 2023, the father told Sevy to "shut up" when he cried, yelled at social workers with Sevy on his lap, and acknowledged that he was unable to care for Sevy. The father stated that his grandfather "beat the fear of the [L]ord in him" and the father "believes that is how kids should be raised."

We are not persuaded by the father's contention that he was merely responding reasonably to the department's unfair "attack[s]" on his parenting ability. The evidence amply supported the judge's conclusion that the father's interactions with the department raised "concerns about his ability to create and maintain a stable, consistent, and safe environment" for Sevy. See Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973) ("violence of temper" and inability to "control unparental traits of character" may constitute unfitness).

d. Reasonable efforts. The judge did not err in concluding that the department made reasonable efforts to prevent Sevy's removal from his home. As the judge observed, "the [d]epartment's obligation to make reasonable efforts to prevent or eliminate the need for removal is contingent on the parent seeking and engaging in necessary services." See Adoption of Christine, 405 Mass. 602, 609 n.14 (1989) ("department acted reasonably in the circumstances" where parent "was unable or unwilling to cooperate" with services offered);

8

Adoption of Serge, 52 Mass. App. Ct. 1, 9 (2001) (department's "obligation to work with [parent] was contingent upon her own obligation to fulfill various parental responsibilities, including seeking and utilizing appropriate services and maintaining regular contact with [the department] and" the child).  Here, the department developed several action plans to help the father address the domestic abuse, anger, substance use, parenting skills, and mental health concerns that interfered with his fitness to parent Sevy.  However, the father did not substantially engage in many of the recommended services, except that he completed a "Parenting Journey" course. After he underwent an independent psychological examination to receive disability benefits, the father did not share the results with the department.  He also failed to provide the department with required drug screens.  Moreover, the father did not join the "Strong Father" program the department recommended and could not verify his presence at virtual parenting classes he claimed to have attended.  The judge properly found that the department made reasonable efforts, and there was no error in her factoring the father's lack of engagement with the department into her determination that the father was unfit. See Adoption of Serge, supra at 8 (lack of meaningful participation in recommended services is relevant consideration in determining parental fitness).

2.  The father's future unfitness.  The judge issued "specific and detailed findings" supporting her conclusion that the father's unfitness was not temporary.  See Adoption of Quentin, 424 Mass. 882, 888 (1997).  See also Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018) (judge must "find that the current parental unfitness is not a temporary condition").  Those findings include, as discussed, the father's history of domestic abuse, aggression, volatile behavior, substance use, untreated mental health disorders, inappropriate conduct during visits with Sevy, and unwillingness to engage in services.  Considered in their entirety, the judge's findings and conclusions established by clear and convincing evidence that the father's unfitness was not temporary.

Decree affirmed.

By the Court (Henry, Hand & Brennan, JJ.[6]),

Paul Little

Clerk

Entered:  November 13, 2024.

---

[6] The panelists are listed in order of seniority.